In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-2078 & 13-2982

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRANCE DANIELS and DAHVEED
DEAN,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 CR 446 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED DECEMBER 11, 2014 — DECIDED SEPTEMBER 30, 2015

Before WOOD, *Chief Judge*, and FLAUM and MANION, *Circuit
Judges.*

MANION, *Circuit Judge.* A jury convicted Dahveed Dean and
Terrance Daniels of armed bank robbery and related gun
offenses. On appeal, Dean and Daniels challenge the district
court's decision to try them jointly, as well as various eviden-
tiary rulings. Additionally, Daniels argues that his constitu-
tional rights were violated when the district court barred him

from the courtroom. Finally, they both argue that the district court erred in refusing to question a juror who, hours after voting to convict, contacted the court to change her vote because she had been "bullied." Because none of the issues presented on appeal requires reversal, we affirm.

## I.

During 2005, there were several armed bank robberies in the Chicagoland area. It took the government some time to track down the suspects, but in February 2008, a grand jury charged Dahveed Dean, Terrance Daniels, and Albert Jones in a six-count indictment. In Count I, Dean and Daniels were charged with robbing the First National Bank in South Holland, Illinois on August 2, 2005, while Count II charged Dean and Daniels with using a firearm in connection with that bank robbery. Count III charged Daniels and Jones with robbing the Bank of Lincolnwood on August 25, 2005, and Count IV charged Daniels and Jones with using a firearm in connection with that bank robbery. Count V charged Dean with robbing the First Bank in Chicago, Illinois, on December 20, 2005, and Count VI charged Dean with using a firearm during that robbery.

Prior to trial, Dean moved to sever his case from his two co-defendants. The government opposed the motion, arguing that joinder was appropriate under Rule 8(b) because "the three defendants in this case all participated in a 'same series of acts or transactions'—a spree of violent bank robberies involving the same *modus operandi* and the same crew of individuals." In making this argument, the government noted that "[t]he evidence at trial will show that the three defendants in this case

were part of a crew of bank robbers … . " The government explained that there were several others involved in the charged bank robberies, including Maurice Wilbon, Marcus Moore, and LaChaun Vance. According to the government, Moore had participated in the August 2, 2005, bank robbery with Dean and Daniels and the December 20 robbery with Dean. Moore later testified at Dean and Daniels' trial. Maurice Wilbon had also participated in the December 20 robbery with Dean and Moore and had previously been convicted by a jury; he did not cooperate with the government. LaChaun Vance had participated in the August 25, 2005, bank robbery with Daniels and Jones and would also later testify at Dean and Daniels' trial. The district court denied Dean's motion to sever "because they were allegedly perpetrated by the same group of individuals and because [the crimes] were allegedly perpetrated in the same manner." Dean renewed the motion two times, but the district court also denied the subsequent motions.

Prior to trial Jones pleaded guilty. Dean and Daniels were then tried jointly, although Daniels was not physically present in the courtroom because the district court barred him based on his pretrial conduct and his refusal to promise the court that he would behave appropriately during the trial. Over the course of several days, the jury heard from Moore and Vance, as well as the victims of the robberies and the investigating officers.

On September 21, 2012, the jury returned a guilty verdict on Counts I and II against Dean and Daniels related to the August 2, 2005, robbery and gun charges; against Daniels on Counts III

and IV related to the August 25, 2005, robbery and gun charges; and against Dean on Count V, related to the December 20, 2005, robbery. The jury acquitted Dean on the gun charge in Count VI. The jury was polled and each juror agreed with the verdict. However, a juror later informed the court that she had felt bullied and wanted to change her vote. The Court Security Officer ("CSO") assigned to the jury also informed Daniels' attorney that he had observed the juror in the hallway outside the jury room and that she had complained of having a panic attack. Daniels and Dean filed motions for a mistrial and requested the district court to inquire further of the juror. The district court concluded that the juror merely expressed concerns related to internal deliberation and that was not appropriate for further inquiry. However, the district court questioned the CSO further and learned that the juror had only left the deliberation room after the jury had reached its verdict. Accordingly, the district court denied the motions for a mistrial.

Daniels and Dean appeal, presenting a host of issues, including: 1) the joinder of Dean and Daniels' case; 2) the exclusion of Daniels from trial; 3) the admissibility of several pieces of evidence; and 4) the court's refusal to question the juror further concerning her "bullying" comments and her absence from the jury room. These questions require a fact-intensive analysis and accordingly, to avoid redundancy, we recount below additional details as necessary.

## II.

### A. Joinder

On appeal, Dean and Daniels first argue their offenses were improperly joined under Fed. R. Crim. P. 8(b), which provides that joinder of two or more defendants is appropriate "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "We review a Rule 8 determination *de novo*." *United States v. White,* 737 F.3d 1121, 1132 (7th Cir. 2013).

The government argues that joinder under Rule 8(b) was appropriate because Dean and Daniels were part of a crew of bank robbers and all of the charges were part of the same series of acts or transactions. The problem for the government, though, is that the indictment did not allege such a theory and in assessing the propriety of joinder, we look "solely to the allegations in the indictment." *White,* 737 F.3d at 1132. In this case, the indictment merely charged three separate bank robberies and three related firearm offenses. Counts I and II charged Dean and Daniels with bank robbery and the related firearm offense and were properly joined. But Counts III and IV charged Daniels and Jones, but not Dean, with bank robbery and gun charges related to the Bank of Lincolnwood robbery. Counts V and VI charged Dean, but not Daniels, with robbing the First Bank in Chicago and the related firearm offense.

In response, the government stresses that under Rule 8(b) "the defendants need not be charged in every count, nor must they be charged with the same crimes." *White,* 737 F.3d at 1132;

*see also* Fed. R. Crim. P. 8(b). While it is true that the defendants in a joint trial do not need to be charged in every count, or with the same crimes, where multiple defendants are charged all of the counts must be related to the same common plan or scheme. *United States v. Velasquez*, 772 F.2d 1348, 1352–53 (7th Cir. 1985). Here, the indictment did not charge a conspiracy, or even separate conspiracies. *Id.* at 1353 ("The indictment need not charge a single overarching conspiracy, provided the separate conspiracies it charges arise from a common plan or scheme and so could alternatively have been charged as a single conspiracy."). Nor did it charge that Dean, Daniels, and others acted as a crew of bank robbers, or allege any facts indicating that they robbed the various banks as part of a common plan or scheme. Rather, the indictment alleged three separate bank robberies (and the related firearm counts) against different combinations of defendants. These allegations are insufficient to support joinder under Rule 8(b). *See Velasquez*, 772 F.2d at 1353 (holding there was misjoinder of a heroin charge where the indictment did not relate that charge "to any of the charges against the other defendants named in the indictment … ").

While Counts III–VI of the indictment misjoined Dean and Daniels, "an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In determining whether the misjoinder had a substantial and injurious effect on the jury, courts look to "the presence of instructions requiring the jury to

consider each defendant separately, the likelihood that evidence relating to the misjoined count would have been admitted in a separate trial and the [strength of the] evidence of the defendant's guilt in [determining whether] the misjoinder [is] harmless." *United States v. Diaz*, 876 F.2d 1344, 1356 (7th Cir. 1989) (citing *Lane*, 474 U.S. at 450). With these factors in mind, we now explore in more depth the evidence presented at the joint trial of Dean and Daniels.

### August 2, 2005 Robbery

A jury convicted Dean and Daniels of robbing the First National Bank in Holland, Illinois on August 2, 2005, and with using a firearm in connection with that bank robbery. The trial evidence of each defendant's guilt on these charges was overwhelming. The jury heard testimony from the supervisor who was working at the bank during the robbery. She explained the robbery in detail, telling the jury that the three robbers were African-American males. She also provided a description of each and told the jury what they were wearing. The supervisor further explained how the robbery took place and told how one of the robbers hit her in the head with his gun and later struck her in the face while she tried to open the vault. After she opened the vault, she explained that the robbers put the money in a pillow case and then sprayed pepper spray into the bank employees' faces before fleeing. And she confirmed that the robbers were armed. The jury also saw a video of the robbery, which the witness explained as it was played for the jury. Another bank employee also testified that more than $45,000 was stolen from the bank.

While the teller could not identify the robbers, Moore, who was one of the robbers, testified at Dean and Daniels' trial. Moore testified at length concerning the planning and execution of the robbery and identified Dean, Daniels, and Charles Vance, as well as himself, as the robbers. He also identified Dean, Daniels, and himself from the bank surveillance video. Moore also confirmed that Dean and Daniels both had guns. The details provided by Moore matched those testified to earlier by the bank supervisor and were also consistent with the video of the robbery. Additionally, cell phone records confirmed various cell calls between the robbers. The government further presented to the jury testimony from an expert witness concerning the use of cell towers. After summarizing how cell phones use cell towers, the expert witness explained that from information concerning which cell tower is being used by a cell phone, he can determine the general location of the person using the phone. The expert witness then testified that a review of the records from the cellular companies confirmed that Dean's cell phone used a cell tower directly west of the First National Bank about 18 minutes before the bank was robbed. (The parties challenge the admission of those records, but as discussed 28–32, they did not preserve that issue for appeal.) Additionally, the government presented testimony from an employee of an automobile dealer who confirmed that on August 3 (the day after the robbery), Dean paid $9,500 in cash to purchase a Chrysler 300M. The car was placed in the name of Shafon Davis, who testified at trial that she was Dean's ex-girlfriend and that he had purchased the Chrysler 300M and put the car title in her name. Moore also testified that a little over a week after the robbery he used

money from the robbery to purchase an automobile and the government admitted a document of title showing Moore's purchase of that car. And LaChaun Vance, who was not involved in the August 2, 2005, robbery, testified that Dean had told him in the summer of 2005 that he had previously robbed a bank and had hit a lady with a gun during that robbery.

### August 25, 2005 Robbery

The evidence of Daniels' guilt on Counts III and IV was even more overwhelming. Daniels was charged in Count III, along with codefendant Jones, with robbing the Bank of Lincolnwood in Skokie, Illinois, on August 25, 2005. Count IV charged Daniels and Jones with using a firearm in connection with that robbery. Jones pleaded guilty but did not cooperate with the government and did not testify at trial. However, another member of the August 25, 2005, crew of bank robbers—LaChaun Vance—did testify. Vance, who had pleaded guilty to robbing the Bank of Lincolnwood, testified in detail concerning Daniels approaching him about participating in that robbery. Daniels asked to use Vance's rental car, a Grand Am, as the getaway vehicle. Vance explained to the jury that prior to the robbery they surveilled the Bank of Lincolnwood, intending to rob it, but that after looking around they aborted the plan. The government presented evidence to corroborate this testimony, namely evidence that on August 22, both Daniels' and Vance's cell phones utilized the tower near the Bank of Lincolnwood and Daniels' cell phone had used the tower closest to the bank.

Vance further testified that on the morning of the robbery, Daniels and Jones drove to the bank in Vance's rental Grand Am, while he and another robber (Lamont Kent) followed in Daniels' car, a red Malibu. Vance identified photographs of all of the robbers involved in the August 25, 2005, robbery and explained their roles. He also identified Daniels and Jones from still-shot photographs made from the bank surveillance video. Vance explained that his role was to create a diversion, but that he never did. Vance testified that he nonetheless called Daniels and falsely said that he had created the diversion. Cell phone records confirmed a telephone call had been made from Vance's phone to Daniels' phone during the time Vance claimed to have made the call. The cellular company's records further showed that two minutes before the Bank of Lincolnwood was robbed both Vance and Daniels' cell phones used the cell tower nearest to the bank. The government's expert also testified that in reviewing three months of cellular records, other than the date of the abortive robbery, August 22, and the date of the actual robbery, August 25, Daniels' cell phone never utilized the cellular tower located nearest the bank.

In addition to Vance's testimony, the jury also saw the video of the robbery and heard testimony from a teller, the bank manager and a security guard (who was also an off-duty police officer). They testified in detail concerning how the robbery occurred, explaining that there were two robbers who both had guns. The security guard explained that the two robbers were African-American and that one wore a hat, sunglasses and either a wig or had long braided hair. Additionally, the security guard testified that one of the robbers took his gun. The bank employees also testified that

they were pepper-sprayed before the robbers left. An internal auditor from the bank testified that nearly $80,000 was stolen from the bank on August 25.

Vance testified that after the robbery Daniels called him and told him he needed to report the Grand Am stolen. Vance explained that his aunt, Shari Young, had rented the car for him, and that he had tried unsuccessfully to contact her on her cell phone. He then called his other aunt, Beverly Lewis (Young's sister), and since the sisters worked together, Vance had her go in to their employer and bring Young out. Both aunts testified. They confirmed Vance's testimony and that Vance had asked Young to report the car stolen. Lewis also testified that Vance was with Lamont Kent, and Young testified that Vance was driving a red Malibu at the time and she recognized the car as "Dog's," which other testimony established was Daniels' nickname. Cell phone records likewise confirmed the calls were made as the parties had testified and the cellular towers' records showed Vance's movements through the Chicagoland area mirroring his testimony.

While Vance was trying to track down his aunt, Daniels was trying to evade capture: A police officer for the Village of Lincolnwood testified that in responding to the bank robbery, he spotted a car with an occupant who fit the description of the suspect. The police officer explained that he gave chase and succeeded in pulling over the suspects on an entrance ramp to a freeway. As the officer radioed in the license plate number, the driver pointed a gun at the officer and then sped away. The officer gave pursuit, but lost the Grand Am. The jury saw a video captured from the officer's dash-cam which confirmed

his testimony. Vance also told the jury that when he met up
with Daniels later that day, Daniels told him that a police
officer had pulled him over and that he (Daniels) had pulled a
gun on him. Vance further testified that Daniels said they had
then abandoned the Grand Am and car-jacked someone, and
in doing so left a gun behind inside a garbage can. The jury
next heard from an elderly gentleman who had been car-jacked
on August 25, 2005, shortly after the bank robbery. He ex-
plained that two African-Americans stole his 2002 Chevy
Malibu. The victim of the car-jacking did not attempt to
identify the perpetrators during the trial; the witness was
visually impaired. However, he had previously identified from
a photo array two other individuals as the car-jackers. Daniels
had not been included in the earlier photo array because he
was not suspected of being involved in the bank robbery at the
time.

A search of the area surrounding the location of the car-
jacking revealed several pieces of damning evidence: The jury
heard testimony from an evidence technician who responded
to the car-jacking site and explained they found a gun in the
car-jacking victim's garbage can. The bank security guard
identified that gun during trial as the weapon the robbers had
taken from him during the August 25, 2005, bank robbery. The
evidence technician also testified that they recovered a wig, a
glove (the right-hand one from a pair), and a Walgreen's bag
from around the corner of the location of the car-jacking. They
also recovered a pair of gray sweatpants on some nearby
bushes. The witness also testified that officers recovered a left-
hand glove (which matched the right-hand glove recovered at
the scene of the car-jacking) on the freeway near where the

other officer had pursued the getaway vehicle. The government presented additional testimony from a forensic scientist who had tested the Walgreen's bag for fingerprints. The expert testified that he had recovered five fingerprints from the bag which matched Daniels' fingerprints and five prints which matched Jones' fingerprints. Recall that Vance had testified that Jones was the other robber who had entered the bank and who fled in the Grand Am with Daniels; Jones had previously pleaded guilty to robbing the Bank of Lincolnwood on August 25, 2005. And the expert on cellular towers testified that Daniels' cell phone used the cell tower next to the car-jacking site about 15 minutes after the bank robbery. He further testified that about ten minutes later, Daniels' cell phone used a cell tower nearest to where the car-jacked Malibu was later recovered.

The jury heard additional testimony from an evidence technician working for the Village of Skokie Police Department. This witness testified that pepper spray, sunglasses and a black skull cap were found near the Bank of Lincolnwood on August 25, after the robbery. The evidence technician also testified that officers later recovered the Grand Am which had been rented by Young for Vance. When seized, the Grand Am had on it a license plate bearing the same numbers as those recorded by the officer who had stopped the car on the on-ramp to the freeway (as confirmed by a still-shot from the dash-cam). However, a search of that vehicle revealed another set of license plates in the trunk—the ones which matched the rental company's records. Vance had previously testified that Lamont Kent (the fourth individual involved in the robbery)

had discussed with him the idea of stealing license plates from another car and replacing the license plates on the rental car. The morning of the robbery, while he waited with Kent in Daniels' Malibu, he saw Daniels and Jones putting the license plate on the Grand Am. The forensic scientist testified that he recovered from the license plates five fingerprints which belonged to Lamont Kent.

The evidence technician further testified that a search of the Grand Am revealed a grey cap, sunglasses, two guns, a pepper-spray holder, a red ball cap, a black skull cap, additional skull caps in the package, a orange-brown shirt, a grey shirt, and a black leather glove. Another forensic scientist testified that DNA recovered from the grey shirt found inside the Grand Am matched Daniels' DNA and "[t]he random match probability, which is the probability of selecting a random individual from the population who would also match this major contributor profile, is one in three trillion from the African American population … ." She also testified that DNA found on the black skull cap matched that of Jones.

**December 20, 2005 Robbery**

Count V charged Dean with robbing the First Bank in Chicago, Illinois, on December 20, 2005, and Count VI charged Dean with using a firearm during that robbery. As discussed below, the evidence of Dean's involvement in the December 20, 2005, armed bank robbery was overwhelming. (Dean was acquitted of the firearm charge in Count VI.)

The evidence concerning the December 20, 2005, robbery included testimony by Moore. Moore had been charged with both the August 2, 2005, and December 20, 2005, bank robber-

ies and had pleaded guilty. As detailed above, Moore testified concerning the August 2, 2005 robbery. *See supra* at 7–9. Moore also explained in detail the planning and execution of the December 20, 2005, robbery and identified Dean, Wilbon, and himself as the robbers. He also identified Dean, Wilbon, and himself from still photographs taken from the bank's video surveillance system. A teller at the bank also testified in detail about the robbery, identified the robbers as three African-American males, and described their clothing. The jury also saw the video from the bank surveillance camera, which the teller explained as it was playing. The teller noted that the robbers put the money in a pillow case and pepper-sprayed the tellers. And Moore testified they took a pink pillow case into the bank to use during the robbery. Another teller testified that over $187,000 was stolen that day.

Additionally, Moore testified that prior to entering the bank, Dean removed two guns from a hidden compartment in the Chrysler 300. The government later presented evidence that during a traffic stop of Dean, about two weeks after the robbery, a search of his Chrysler 300 uncovered two handguns in a hidden compartment in the dashboard. Dean admitted to police that these guns belonged to him. (Dean challenged their admission at trial, but as discussed *infra* at 27–28, the district court did not err in admitting the guns into evidence.)

The government also presented testimony from an employee of a car dealership who, less than a month after the robbery, sold a Lincoln Navigator to a woman named Nicole Gibson (who was with an unidentified man) for $6,500 cash, plus a Chrysler 300 as a trade-in. Gibson testified that Dean

had purchased the car in her name and also later bought accessories for the car. An employee at an automobile accessory business also testified that in late 2005 or early 2006, Dean had purchased automotive accessories for a Lincoln Navigator and a Chevy Caprice, including a sound and video system, and Lamborghini doors, at a cost of approximately $18,000, and that Dean had paid cash. Gibson also testified that on January 6, 2006, someone brought her $20,000 on Dean's behalf to bail him out of jail. Dean gave another ex-girlfriend, Shafon Davis, $6,000 to bond out Wilbon. Davis also testified that on December 20, 2005 (the same day as the robbery), Dean bought her a Buick Riviera, paying $5,500 in cash.

In addition to these witnesses, the government also subpoenaed a friend of Dean's named Stanford Stogner. Stogner testified that in the winter of 2005, Dean and Wilbon and a third individual, whom he did not know, came to his house in a gold Chrysler 300. They brought in a pillow case that had in it what looked "[l]ike a million bucks." Stogner testified that they were sorting the money and that the cash still had the bands on it.

As the above detailed discussion demonstrates, the evidence of Dean and Daniels' guilt for each of the respective counts of conviction was overwhelming. Each defendant was identified by another participant in the robbery: Moore identified Dean and Daniels as perpetrators of the August 2 robbery and Dean as a perpetrator of the December 20 robbery; Vance identified Daniels as the other perpetrator of the August 25 robbery. Moore and Vance's testimony concerning the execution of the robberies was consistent with the bank employees' testimony, as well as the video recordings. Cell

phone records further corroborated the witness testimony concerning the events leading up to and following the robberies, and an expert witness tied the defendants' cell phones to cellular towers located near the banks at the time of the robbery and near the car-jacking site at the time of the car-jacking. Testimony by Vance's aunts also corroborated his testimony concerning the Grand Am used during the August 25 robbery. DNA and fingerprint evidence further tied Daniels to the August 25 robbery. The cash purchases of cars (and car accessories) quickly followed the robberies, and there was also a flush of cash available to provide bail. And a friend of Dean saw him with Wilbon and another man splitting a large amount of money around the time of the December 20 robbery. This money was brought into the house in a pillowcase—and several witnesses testified that the robbers had used pillow cases during the robbery. Evidence also tied Daniels to the car-jacking where further evidence of the robbery was found, including the security guard's gun. While much evidence came in concerning counts unrelated to each defendant, the evidence of guilt was overwhelming.

Moreover, the district court provided the jury with a detailed instruction making clear that each count and defendant must be judged separately:

> Each count of the indictment charges the defendants with having committed separate offenses. You must give separate consideration both to each count and to each defendant. Your verdict of guilty or not guilty of an offense charged in one count should not

> control your decision as to any other count. You must consider each count and the evidence relating to it separate and apart from every other count. You should return a separate verdict as to each defendant and as to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to that defendant under any other count.

A jury can easily understand that evidence related to the August 25 robbery does not establish guilt for the August 2 or December 20 robbery. In fact, the jury's acquittal of Dean of the gun charge in Count VI shows that the jury methodically considered the evidence for each count and charge separately.[1]

In response Dean and Daniels point to a statement the district court made during trial that the remaining evidence that day would apply to the entire case, when the evidence only applied to the December 20 bank robbery charges against Dean. Again, some additional facts are needed: Prior to the start of trial, Dean's attorney had asked the district court to instruct the jury that certain evidence was only related to the August 25 robbery charges against Daniels. The district court

---

[1] The bank employee who testified about the December 20 bank robbery only identified "Robber One" as being armed. Moore had identified Robber One as Wilbon. Further, in presenting the surveillance video to the jury, the government highlighted the fact that Robber One had a gun, but did not likewise point to a display of a weapon by the other robbers. Conversely, with both the August 2 and August 25 robberies, the bank employees testified that both robbers were armed and the videos confirmed the presence of weapons.

agreed and before calling each witness, the government informed the court whether the evidence pertained to Dean alone, or to both defendants, and where appropriate the district court instructed the jury, as follows: "[T]he testimony of the next witness and some of the following witnesses will pertain only to the August 2005, robbery of the Bank of Lincolnwood in Skokie, Illinois. Defendant Dahveed Dean is not charged with the August 25, 2005, robbery … ."

The district court gave the above instruction prior to each witness who the government noted was to testify about the August 25, 2005, robbery. However, one afternoon, prior to presenting its final witnesses for the day, the government informed the district court that the instruction was not needed. The district court then instructed the jury that the evidence pertained to the entire case. The upcoming witnesses, though, pertained to only the December 20 robbery charges against Dean. However, neither Dean's nor Daniels' attorney objected to this statement. And given that the jury was later told that it must consider each count separately, and given the overwhelming evidence of guilt, we conclude that this misstep did not prejudice the defendants.

Dean also claims that there were two instances where the district court wrongly informed the jury that upcoming evidence would apply to the entire case, when the evidence focused mostly on Daniels' role in the August 25 bank robbery. Technically, the district court should have said that some of the testimony would apply to some counts and some testimony to other counts, but again, given the later instruction to consider the counts separately and given the overwhelming evidence, we

conclude that Dean was not prejudiced by this statement. Rather, the overwhelming evidence of Dean and Daniels' guilt on the respective counts convinces us that there was no prejudice stemming from the misjoinder of Counts III–VI.

### B. Exclusion of Daniels from Trial

Daniels next challenges his exclusion from trial. While a defendant has a right to be present at every stage of trial, that right is not absolute. *Illinois v. Allen*, 397 U.S. 337, 338 342–43 (1970); *United States v. Benabe*, 654 F.3d 753, 767–68 (7th Cir. 2011). A defendant may impliedly waive his right to attend trial if "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343; *Benabe,* 654 F.3d at 768 (noting a defendant may waive right to be present either by consent or misconduct). Further, a court dealing with an incorrigible defendant "must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Allen*, 397 U.S. at 343.

In this case, prior to trial, even though he was represented by counsel, Daniels began filing *pro se* documents with the district court claiming he was not subject to the government's jurisdiction.[2] The district court held a hearing to address

---

[2]  Daniels' filings have "the earmarks of the 'Sovereign Citizens' movement," *El v. AmeriCredit Financial Services, Inc.*, 710 F.3d 748 (7th Cir. 2013),

(continued...)

Daniels' filings, at which he asked Daniels if he no longer wanted to be represented by his attorney. Rather than responding, Daniels continued rambling about his status as a security interest holder. After stating he found no reason to replace Daniels' attorney, the district court told Daniels that he "may attend the trial because that's his right to attend the trial," but that "if he demonstrates any indication that he will be disruptive during the trial, the Court will take appropriate action and it could include … barring him from the courtroom if he is disruptive … ." The court further told Daniels that he could only file documents through counsel, but Daniels continued to submit *pro se* filings again using the boilerplate language of the "sovereign citizen movement."

Then at a status hearing held on August 29, 2012, while the court was addressing the government's pretrial motions, Daniels raised his hand to speak. The court explained that it does not "entertain questions from defendants who are represented by counsel," to which Daniels responded, "I'm not represented by him." The court then asked Daniels' attorney if he had anything to raise and his attorney replied: "I am not asking to address the Court at this time, Judge." The district court then said: "There will be no addressing the Court then by

---

[2] (...continued)

which, according to the FBI, purports to "believe the government is operating outside of its jurisdiction and generally do not recognize federal, state, or local laws, policies, or governmental regulations." http://info.publicintelligence.net/FBI-SovereignCitizens.pdf. This movement often recruits in prisons. *Id.*

defendants unless their lawyer addresses the Court." After some additional discussion concerning pretrial matters, the district court adjourned the hearing, at which point Daniels yelled twice, "[a]re you denying me my right to speak?" A minute order issued after the hearing stated that Daniels "persisted in his behavior and appeared to refuse to leave the courtroom even after the court indicated that the matter had concluded, at which point the United States Deputy Marshals had to forcibly escort Daniels from the courtroom." In the minute order, the court "again warned that further disruptions by Daniels during any of the proceedings related to this case, including the trial, may result in his exclusion from the court-room during trial."

Later during a pretrial conference, the court addressed Daniels' attorney, stating:

> Since there were certain incidents that happened previously in this court relating to your client and I made a statement that … if any defendant to that matter, if any party, including a special agent of the FBI acts disruptive, I will remove the person from the courtroom. And as I stated, your client has every right to be in the courtroom. … and I hope he exercises that right and stays in the courtroom. And if he decides that he does not want to be civil in the courtroom and let the procedures take place, then I need to know that right now.

Daniels' attorney replied: "I believe he has a right to be here as the Court stated and I would just leave it at that at this

point." The district court said: "No, I'm not going to leave it at that," and had Daniels step up. Daniels refused to be sworn in, again claiming sovereign status. The court told him "during the trial, you'll have to act in a civil manner. And if any time during the trial you decide to be disruptive, which I hope you don't, then I will have no alternative but to consider that you have surrendered your right to be in the courtroom during your trial … ." The court asked Daniels if he had "anything to say about that," to which Daniels responded, "Yes. I conditionally accept your offer that trial is not needed. Pending my ongoing private administrative remedy will make any proceedings along with this trial moot and I do not participate in any of the public benefits which this court have to offer." After some more non-responsive babbling, the court asked Daniels: "Do you promise to sit in court without being disruptive?" Daniels again refused to answer. The court tried again, stating: "I just want to make sure that you agree to be not disruptive. And if you could make that promise to me, then I will allow you to be present in the courtroom." Daniels again refused to respond, so the court told Daniels the he would be excluded from trial, but also informed Daniels' attorney that, "if your client decides before Monday to agree to tell the Court that he will not be disruptive, then he will be most welcome to do so and be present for the trial in person."

On Monday, when the jury venire was ready, the district court ordered Daniels to appear to revisit the question of whether Daniels would be barred during the trial. The district court began by summarizing Daniels' past misconduct and then stated that he would have Daniels sworn in and then ask if he

would promise to behave during the trial. The district court directed Daniels twice to raise his hand to be sworn in, but Daniels did not comply. At that point the Marshal directly asked him "Are you going to raise your hand?" and Daniels said "No." Daniels then began reading nonsense from a prepared script. This passage is illustrative of the totality of his comments: "I conditionally accept upon proof of claim that as a secure party creditor and a holder in due course have I not tendered payment with the CFO and the clerk of this Court to discharge all debts and liabilities and obligation of the defendant according to the commercial code of this state, UCC 3-603. And upon proof of claim that with no outstanding charges, the defendant, Terry Daniels, I move the Court to enforce the laws of the state to discharge the collateral — namely, myself — and set at liberty now. Are you refusing my tender of payment, Judge?"

When Daniels stopped rambling, the district court explained to Daniels that he had a constitutional right to be present during the trial, but that with his conduct he was surrendering that right. The district court then gave him one last opportunity to assure the court that he would "obey the Court's rules and not disrupt this Court's proceedings no matter what [he] believe[d] [his] sovereign status, quote/unquote, is." The district court then said: "What I'm going to ask you one more time: Are you able and do you promise to not disrupt this trial?" Daniels responded again with his nonsensical ramblings: "I conditionally accept your offer upon proof of claim—" At that point the district court barred Daniels from trial, but stressed that "when he obeys this Court's orders and raises his hand, is sworn in and promises this Court that he will not be disruptive and not cause

an unfair trial for his codefendant Mr. Dean and to the government, then he will be allowed to return to the courtroom."

Daniels' obstinacy held firm and he neither attended trial nor watched trial on the video feed. At the conclusion of the government's case, the district court had Daniels brought back to court to inform him of his right to testify and to confirm that he intended to waive that right, as Daniels' attorney had represented. Even at this point, Daniels refused to raise his hand and be sworn in and, as the following exchange shows, belligerently refused to respond to the district court's inquiry:

> Court: Now your lawyer, Mr. Clarke, has told me that you have told him that you do not wish to testify at your trial. Is this correct, sir?

> Daniels: I conditionally accept your offer upon proof of claim that trial is not needed pending my ongoing—ongoing private administrative remedy and that being a tender of payment, it's already been made with the CFO and the clerk of court to discharge all debts and liabilities and obligations of the defendant. And according with the commercial code of this state, UCC 3603, (sic) and upon proof of claim there were no outstanding charges against the Defendant Terry Daniels, I move this Court to enforce the laws of the state to discharge the collateral, namely myself, and to be set at liberty immediately.

After several unsuccessful attempts to seek Daniels' confirmation that he did not want to testify at trial, the district court ruled that Daniels had waived his right to testify.

The above summary is merely a glimpse of Daniels' belligerent behavior. The district court was exceedingly patient with Daniels and gave him more than ample opportunity to attend his trial. But when, after being warned that he would forfeit his right to attend trial, Daniels refused outright to be sworn in and assure the court that his conduct would not continue during trial, the district court had no option but to hold that Daniels had forfeited his right to attend trial.

Further, in holding that Daniels had forfeited his right to attend trial, the district court scrupulously followed our guidance in *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011). In *Benabe*, we explained that a defendant may impliedly waive his right to be present at trial if, after he is initially present at trial, he exhibits a pattern of disruptive misconduct that justifies removal. *Id.* at 771. *Benabe* also explained that a defendant is "initially present at trial" if he is present on the day that jury selection began. *Id*. at 771–72. Thus, in this case, on the day jury selection began the district court called Daniels back once more to allow him the opportunity to participate in the upcoming court proceedings. But as detailed above, Daniels again refused to be sworn in or provide any assurance that he would not disrupt the proceedings, notwithstanding the court's warning that his refusal to do so would result in him being barred from trial. And significantly, Daniels' refusal to provide these assurances came after he had previously disrupted the court proceedings by yelling twice at the judge, before being removed by the marshals. Given the defendant's previous outburst, the

district court reasonably sought assurances from Daniels that he would not repeat that behavior during trial. But Daniels refused to even be sworn in! Under these circumstances, the district court did not abuse its discretion in barring Daniels from trial.

### C. Evidentiary Rulings

On appeal, Dean and Daniels also present several challenges to evidentiary rulings, two of which we previously mentioned. *See supra* at 8, 15. We begin with those.

### Admission of Handguns

First, Dean challenges the admission of two handguns police recovered during a traffic stop that occurred on January 3, 2006. Dean does not challenge the validity of the stop or the search that uncovered the two handguns from a trap compartment in the dashboard of his Chrysler 300. Rather, Dean argues that the guns should not have been admitted into evidence because the evidence was irrelevant since there was no direct evidence that those guns were the ones used during the robberies. Dean also argues the admission of the guns was inadmissible character evidence and unfairly prejudicial. This court reviews the district court's evidentiary rulings for an abuse of discretion. *United States v. Volpendesto*, 746 F.3d 273, 287 (7th Cir. 2014).

The district court did not abuse its discretion in admitting the guns into evidence. At trial, Moore, who was also charged with the December 20, 2005, robbery, testified that just before that robbery, Dean removed two guns from a trap in the dashboard of his Chrysler 300. That police recovered two guns from a hidden compartment in Dean's car slightly over two

weeks after the December 20, 2005, robbery was relevant to Dean's guilt on both the robbery and the use of a weapon counts. It was relevant to the robbery count because it corroborated Moore's testimony concerning the details of the December 20, 2005, robbery. It was relevant to the weapons count (and not improper character evidence) because a jury could reasonably infer, given the location of the guns and closeness in time of the seizure to the robbery, that the guns recovered were the guns used during the robbery. Further, there was no undue prejudice flowing from the admission of the guns—the government did not attempt to portray Dean as a bad guy because he possessed guns; the government used the evidence to corroborate Moore's testimony and to attempt to establish Dean's guilt on the weapons count. In the end, though, even with this evidence, the jury acquitted Dean of the gun charges related to the December 20, 2005, robbery. But there was no error in admitting the gun evidence in the first instance.

### Admission of Evidence Related to Cellular Towers

As detailed above, at trial the government presented evidence concerning cellular telephone calls made by the bank robbers and the location of the cell towers used for those calls. The government obtained this information from Dean and Daniels' cellular providers pursuant to a court order issued under 18 U.S.C. § 2703(d). The Stored Communications Act authorizes the government to obtain a court order requiring "a provider of electronic communication service … to disclose a record or other information pertaining to a subscriber to … such service (not including the contents of communications)." 18 U.S.C. § 2703(c). A judge "shall issue" the order only if the government "offers specific and articulable facts showing that

there are reasonable grounds to believe that the … records or other information sought [] are relevant and material to an ongoing criminal investigation." *Id.* § 2703(d).

On appeal, Dean and Daniels do not challenge the issuance of the court order, but rather claim that the Fourth Amendment required the government to obtain a warrant, upon a showing of probable cause, to obtain the cell tower location information. They contend that a court order based merely on "specific and articulable facts," as allowed by § 2703(d), which in essence is a reasonable suspicion standard, *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 287 (4th Cir. 2013), violates their Fourth Amendment rights.

"We have yet to address whether … cell-tower information that telecommunication carriers collect is protected by the Fourth Amendment." *United States v. Thousand*, 558 Fed. Appx. 666, 670 (7th Cir. 2014). To date, three circuits have directly addressed this issue. The Eleventh Circuit in an *en banc* decision, *United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (*en banc*), and the Fifth Circuit in *In re United States for Historical Cell Site Data*, 724 F.3d 600 (5th Cir. 2013), both held that the defendants did not have a reasonable expectation of privacy in the cellular company's records of the cell towers utilized by their cell phones. *Davis*, 785 F.3d at 511; *Historical Cell Site Data*, 724 F.3d at 611–13. Conversely, the Fourth Circuit in *United States v. Graham*, 796 F.3d 332, 338 (4th Cir. 2015), held that the "warrantless procurement of the [cell site location information] was an unreasonable search in violation of Appellants' Fourth Amendment rights." *Graham*, though, nonetheless upheld the

district court's denial of the defendants' motion to suppress the cell tower location information "because the government relied in good faith on court orders issued in accordance with Title II of the Electronic Communications Privacy Act, or the Stored Communications Act ("SCA") … . " *Id.*

Today, however, is not the day to take sides in this circuit split because neither Dean nor Daniels filed a motion to suppress the cell tower location information in the district court. Federal Rule of Criminal Procedure 12(b)(3) identifies a "motion to suppress evidence" as a motion that must be made before trial. Fed. R. Crim. P. 12(b)(3). At the time of Dean and Daniels' trial, Rule 12(e) further provided that "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides." Fed. R. Crim. P. 12(b)(3). However, "waiver," as used in Rule 12(e), did not mean the intentional relinquishment of a known right. *United States v. Johnson,* 415 F.3d 728, 730 (7th Cir. 2005). Nonetheless, it barred appellate review unless the defendant established good cause for failing to file a motion to suppress. *United States v. Acox*, 595 F.3d 729, 731 (7th Cir. 2010) (quoting Fed. R. Crim. P. 12(e)); *United States v. Murdock,* 491 F.3d 694, 698 (7th Cir. 2007); *Johnson,* 415 F.3d at 730–31.

While this appeal was pending, Rule 12 was amended, and "[t]he provision addressing the effect of a failure to raise an issue in a pretrial motion, formerly found in Rule 12(e), was relocated to Rule 12(c)(3), effective December 1, 2014." *United States v. McMillian*, 786 F.3d 630, 636 n.3 (7th Cir. 2015). The revised rule deleted the reference to "waiver," because "the rule [did] not contemplate waiver as that term is traditionally used in criminal cases." *McMillian*, 786 F.3d at 636 n.3 (citing Fed. R.

Crim. P. 12(c), Advisory Committee's Note), and now provides: "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). While Rule 12(c)(3) deleted the reference to "waiver," "the amendment did not alter the applicable standard," *McMillian*, 786 F.3d at 636 n.3, which means that "[b]efore a court may consider an untimely motion to suppress, 'a defendant must first establish good cause for the absence of a pretrial motion.'" *McMillian*, 786 F.3d at 636 (quoting *Acox*, 595 F.3d at 731).

On appeal, Dean and Daniels argue they had good cause for failing to bring a motion to suppress because the legal authority supporting their argument was not decided until after pre-trial proceedings were completed. But nothing prevented Dean and Daniels from presenting a Fourth Amendment argument to the district court in a motion to suppress the cell tower location evidence. The defendants knew all they needed to know in order to make the Fourth Amendment argument, as one of first impression. That additional case law later is handed down which may better support an argument does not constitute "good cause" for failing to make a constitutional argument in a motion to suppress within the deadline established by the court. Or more precisely, we hold that the district court would not have abused its discretion had it found good cause lacking. *See McMillian*, 786 F.3d at 636 n.4 (explaining that where a defendant does not present a timely motion to suppress to the district court and seek to establish good cause, "we ask whether the district court would have abused its discretion had it denied a

request to present an untimely motion"). Accordingly, because the defendants did not file a motion to suppress the cell tower location evidence on Fourth Amendment grounds, and because good cause does not excuse that lapse, we cannot consider their argument on appeal.[3]

### Admission of Evidence Seized During An October 7, 2005 Search of Dean's Automobile

Prior to trial, Dean moved to suppress evidence recovered during an October 7, 2005, search of his automobile, claiming the police lacked probable cause to arrest him and that the subsequent search of the car was unconstitutional. To understand Dean's argument, some additional facts are needed.

On October 6, 2005, Chicago Police Officer Rick Green spoke with a confidential informant who stated that "Davi" had recently told the confidential informant that he ("Davi") had participated in several bank robberies within the past few months. The confidential informant likewise identified Vance (by his nickname) as involved in the bank robberies. "Davi" also told the confidential informant that they used wigs to conceal their identities and mace to blind the bank employees. "Davi"

---

[3] Further, even if we were to consider the issue and adopt the Fourth Circuit's approach in *Graham*, 796 F.3d 332, it would not benefit Dean and Daniels because, as in *Graham*, the cell tower location evidence would still be admissible under the good faith exception. *Id.* at 338. Prudentially, too, it is best to leave this issue for another day when the court may benefit from full briefing and argument—which isn't the case here as two of the three circuit decisions directly on point were handed down following briefing and oral argument. *Davis*, 785 F.3d 498 (decided May 5, 2015); *Graham*, 796 F.3d 332 (decided Aug. 5, 2015).

further told the confidential informant that he planned to rob another bank the next day. The confidential informant told Officer Green that he knew "Davi" from the neighborhood, that "Davi" lived in the area of 90th and Cottage Grove and drove a gold Chrysler 300M. Officer Green searched the Chicago Police Department database trying to identify the individual and after pulling 10–15 photographs the confidential informant identified Dahveed Dean as "Davi." The Chicago Police department contacted the FBI and the FBI then spoke with the confidential informant.

At the time that the FBI interviewed the confidential informant, it had already been investigating the August 25, 2005, robbery and knew that the robbery had been committed by two armed African-American males, one of whom appeared to be wearing a wig, and that the robbers used pepper spray. The FBI had also already interviewed Young (LaChaun Vance's aunt who had rented the Grand Am used as the getaway car), and the FBI believed Vance was involved in the earlier robbery. And from their earlier investigation, the FBI knew that Vance was friends with Dean.

The next day, officers surveilled the area where Dean's car was parked. They saw Dean and another individual (later identified as Moore) meet, get in another car, then leave the area. Surveillance followed the duo and they later returned to the area and got in Dean's car. The surveillance continued throughout the morning and at one point Detective Green saw Dean and Moore parked outside a wig shop, where they met with two other individuals.

At some point, the officers lost surveillance of Dean's car for about an hour. After losing sight of Dean, they learned that a bank robbery had just happened elsewhere in Chicago. Officers later saw Dean's car return to the wig shop, at which time they stopped it and arrested Dean and Moore. Dean signed a written consent to search the car. During a search of the car, officers recovered a wig, a pair of sunglasses, latex gloves, a nylon skull cap, a pink pillow case, and pepper spray.

During questioning, Moore admitted that they were going to rob a bank, but assured the officers he would never get involved in anything like that again. Dean and Moore were eventually released without being charged because, as it turned out, they had abandoned their plan to rob a bank that day and were not involved in the actual bank robbery that had occurred. It is unclear whether at the time the officers arrested Dean and Moore they believed the duo had participated in the recent bank robbery, or had received other information indicating that different perpetrators were involved.

At trial, officers involved in the October 7 surveillance testified concerning the surveillance and the evidence seized from Dean's car was admitted into evidence. Dean contends that it was error to admit that evidence because probable cause did not support his arrest and that the search of his car was unconstitutional. Dean had moved to suppress this evidence before trial, so we review the district court's factual findings for clear error and questions of law *de novo. United States v. Lemmons*, 282 F.3d 920, 923–24 (7th Cir 2002).

The officers who arrested Dean did not have an arrest warrant, but an officer may make a warrantless arrest consistent

with the Fourth Amendment if there is "probable cause to believe that a crime has been committed." *Washington v. Haupert*, 481 F.3d 543, 547 (7th Cir. 2007). "An officer has probable cause to make an arrest only when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." *Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir. 2011). Courts look to a totality of the circumstances, and ask whether a reasonable officer would believe that the suspect had committed a crime. *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013).

In this case, there was probable cause to support Dean's arrest for either attempting to commit bank robbery or conspiring to commit bank robbery. "It is well settled that probable cause can be established by an informant's tip along with corroboration by police work." *United States v. Banks*, 405 F.3d 559, 570 (7th Cir. 2005). Here, the officers had information which corroborated the informant's tip that Dean had previously been involved in bank robberies. Those robberies involved African-American perpetrators who pepper-sprayed the tellers. And from their investigation, the officers knew Dean was friends with Vance and that Vance was connected to the Grand Am used during the August 25, 2005, robbery. Surveillance on the morning of the robbery further corroborated the tip that Dean was preparing to rob a bank that day, as officers saw the duo parked outside a wig shop and Moore was seen inside the wig shop. The officers knew that a wig had been used in the prior bank robbery. The totality of circumstances supported a finding

of probable cause to arrest Dean and accordingly the subse-
quent search was constitutional.

Further, if the evidence seized from Dean's car on October
7, 2005, was improperly admitted, any error would be harmless.
In discussing the overwhelming evidence supporting the
convictions above, we did not even consider the additional
evidence seized from Dean's car on October 8 which corrobo-
rated Moore's account of the robberies, because the other
evidence was overwhelming. *United States v. Manganellis*, 864
F.2d 528, 539 (7th Cir. 1988) ("An error is harmless if the other
untainted incriminating evidence is overwhelming.").

### D. The Disgruntled Juror

As noted, the jury convicted Daniels on two counts of bank
robbery and two counts of using a firearm in the commission of
a bank robbery, and Dean on two counts of bank robbery and
one count of using a firearm in the commission of a bank
robbery. The verdict form was signed by all twelve jurors and
dated. Each juror was polled and asked, "Was this and is this
now your verdict?" Each answered affirmatively. However,
later that day a juror went to the court's chambers and told a
staff member: "I cannot live with myself knowing what I did. I
felt bullied into making the decision that I made." Over the
weekend, the juror left a message on the court's voicemail
stating: "I wanted to pretty much change my verdict to not
guilty because I feel I was bullied and railroaded in the jury
deliberation process and I, for one, cannot live with the verdict
that I—I guess handed down." A court security officer ("CSO")
also told Daniels' attorney that he had seen the juror complain-

ing of a panic attack and sitting in the hallway near the jury deliberation room.

Daniels and Dean filed a motion for a mistrial and asked the court to question the juror about her comments and also about her leaving the jury room. The court decided that there was no evidence that the juror had been subjected to outside influences or a physical threat, and thus no grounds under Rule 606(b) for questioning the juror.[4] The judge also informed the parties that he had on one occasion seen the juror step out of the jury room, but that the juror had said to the CSO "that the jury had already reached a verdict so why couldn't she step out." The court further stated that it had asked the CSO if the juror had left the room on any other occasion and the CSO told the court that the juror had left a second time, but that was also after the jury had reached a verdict and it was on that occasion she had made the comment about an "anxiety attack" or "panic attack."

---

[4] Federal Rule of Evidence 606(b) provides:

(b) During an Inquiry Into the Validity of a Verdict or Indictment.

(1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions. A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Daniels and Dean claim that the district court erred by not questioning the juror to determine if by "bullied" she meant that she had been subjected to outside influence or physical violence. They argue that her statement was ambiguous and that further inquiry was thus needed. However, nothing the juror said raised the possibility of an outside influence. She spoke of being bullied and railroaded in the "deliberation process." And she said "she *felt* bullied." While in his initial consideration of the issue the district court noted that her statements might indicate physical bullying or outside influences, after considering arguments from the parties, the district court reached a contrary conclusion. There was just no evidence of outside influence or a threat of physical harm, or that the juror was absent during deliberations or was mentally incompetent. Under these circumstances, we cannot say that the district court abused its discretion in refusing to further question the juror. *See United States v. Briggs*, 291 F.3d 958, 961–62 (7th Cir. 2002) (holding the district court did not err in denying a hearing where a juror claimed she had been "intimidated" by other jurors because the juror "did not allege that any extraneous prejudicial information was brought to the jury's attention or that any outside influence was brought to bear on any juror[ ]"); *United States v. Ford*, 840 F.2d 460, 465 (7th Cir. 1988) (holding the district court did not err in denying a hearing where a juror had alleged "extreme and excessive pressure on individuals to change votes," because there was no claim of "external influence"); *Tanner v. United States*, 483 U.S. 107, 119 (1987) ("[C]ourts have refused to set aside a verdict, or even to make further inquiry, unless there be proof of an adjudication of insanity or mental incompetence closely in advance … of jury

service [or] proof of a closely contemporaneous and independent post-trial adjudication of incompetency.”).

## III.

While the government misjoined Dean and Daniels in a single indictment which charged some unrelated counts of bank robbery and using a firearm in connection with a bank robbery, that error was harmless. The evidence overwhelmingly established that Dean and Daniels robbed the First National Bank in South Holland, Illinois on August 2, 2005, and used firearms while doing so; that Daniels robbed the Bank of Lincolnwood on August 25, 2005, and used a firearm while doing so; and that Dean robbed the First Bank in Chicago, Illinois, on December 20, 2005. The district court, however, did not err in admitting as evidence the guns seized from Dean's car when he was stopped in January of 2006, the various evidence seized from his car when he was arrested on October 7, 2005, or the cellular tower records and related testimony. Finally, the district court did not err in refusing to question the disgruntled juror when there was no evidence that she faced outside pressure or was incompetent to serve as a juror. For these and the foregoing reasons, we AFFIRM.