In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1002

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN THOMAS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 15-CR-74 — **Richard L. Young,** *Judge.*

ARGUED MAY 16, 2018 — DECIDED JULY 26, 2018

Before FLAUM, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Whitney "Strawberry" Blackwell stole cash and drugs from defendant-appellant John Thomas. His effort to punish her and recover his cash and drugs has landed him in federal prison with a life sentence. Thomas kidnapped Blackwell's younger brother and sister in Indiana and had them taken to Michigan and Kentucky, respectively, before law enforcement tracked them down.

Thomas raises four issues on appeal: (a) that Blackwell was allowed to offer inadmissible and prejudicial testimony for the prosecution; (b) that the district court should have excluded cell-site location information about cell phones associated with Thomas; (c) that the court erred in its Sentencing Guideline calculations; and (d) that the court erred under *Alleyne v. United States*, 570 U.S. 99 (2013), by failing to have the jury decide that the kidnapping victims were under 18 years old, which increased the mandatory minimum sentence. Thomas did not raise any of these issues in the district court.

We affirm the convictions and sentence. We first review the facts of the case and then turn to Thomas's new arguments. To summarize our conclusions: (a) the district court did not plainly err in dealing with Blackwell's testimony and her apparent inability to follow instructions about answering what she was asked and not raising certain subjects; (b) the court did not err by admitting the cell-site location evidence where Thomas did not move to suppress or even object to that evidence; (c) the court did not plainly err in its guideline calculation; and (d) the court made an *Alleyne* error regarding the ages of the kidnapping victims, but the error was harmless, calling for no remedy under the plain-error doctrine.

I.  *Factual and Procedural Background*

On Thanksgiving night 2014, defendant John "Jay" Thomas met Whitney "Strawberry" Blackwell at Club Venus in Detroit where she worked as a stripper and prostitute. When Blackwell testified at trial, the prosecution asked the usually innocuous question, "What is the first thing you said to Mr. Thomas, the defendant, when you met him?" Blackwell said, "I asked him if he wanted his d*** sucked." After this

first encounter, Thomas took in Blackwell as one of his girl-friends and supported her from his drug dealing. She never worked at Club Venus again. Their short and volatile relationship erupted on Valentine's Day, 2015. Blackwell testified at trial that Thomas "beat me up" that day, apparently because she "drank all of his water," though this supposed provocation never made it before the jury. After that beating, Blackwell decided to leave Thomas.

When the "baby-sitter" whom Thomas assigned to "snitch on" Blackwell was upstairs in his bedroom, Blackwell testified, she "tiptoed around the house all sneaky like," and stole from Thomas $50,000 in cash, 2,500 OxyContin pills, and an ounce of cocaine. Blackwell loaded up her contraband, her belongings, and her young child, and she fled. She paid a friend to drive her from Detroit to Chicago. She arrived in Chicago and stayed at the home of the father of one of her children until she suspected Thomas's associates were tracking her down. According to Blackwell's trial testimony, Thomas's friends would do "whatever Jay told him to do … [g]o out and sell drugs, shoot people, steal something." Fearing that Thomas would find her in Chicago, she left for Indianapolis, where her family lived and where she grew up. After she had left, Thomas and others tried to raid the Chicago residence where she had been staying.

Thomas and his henchmen regrouped in Detroit. They decided to expand their search to Indianapolis. Thomas dispatched four of his underlings to an Indianapolis address. Telling them, "I want my money and my drugs," Thomas promised them $45,000 if they found Blackwell and provided them with a "burner" phone and $1,000 in cash. He also provided specific instructions about Blackwell's young son: "if

you see C—, bring me C—." Thomas's henchmen went to Indianapolis and began their search for Blackwell. They obtained her family's address from local drug dealers. They staked out the home and saw Blackwell drop off her mother and leave. After alerting Thomas, he told them to wait for him. He drove from Detroit with several more confederates and asked one of his co-conspirators to buy zip ties as he prepared his next steps.

In the early hours of March 2, 2015, Thomas and his gang drove to the house. Thomas kicked in the door. He found a family friend sleeping on the floor and ordered an accomplice to restrain the man with the zip ties. Thomas and others then broke into Blackwell's mother's bedroom, where her mother slept with Blackwell's younger brother and sister. Thomas asked the mother, "Where the f*** is Strawberry? Where the f*** is my money? That b**** took my money and took my dope. You know where she at?" Blackwell's mother said she did not know where the money was. Thomas ordered one accomplice to take the brother while Thomas himself took the sister. Thomas and his henchmen drove away from the house with the brother and sister in separate vehicles. After driving back to Detroit, Thomas ordered the brother to be kept in Michigan. He told a group of his underlings to take the sister to his house in Kentucky.

Thomas directed his henchmen throughout the kidnapping. He told them to tell Blackwell's brother that he would be raped if he did not tell them where the money was. He also told them, "Get my money. … Squeeze my money out of him." The associates followed Thomas's lead, telling the brother that he would be raped if he did not cooperate. When the brother did not respond, one of the conspirators testified,

Thomas told her "to do whatever I have to do; hurt him, cut him, beat him up, get whatever I could out of him." Thomas also told the boy on speakerphone, "I cut your sister's fingers off already and if you don't tell me where everything's at, [another person is] about to cut your fingers, too." Still getting no response from the brother, one kidnapper took a knife and actually cut the webbing of the brother's finger until "it was bleeding very bad."

After Thomas seized the children, Blackwell's mother called the police. Officers overheard several ransom calls from Thomas, and they began a manhunt in Indiana, Michigan, Ohio, and Kentucky. Officers arrested Thomas in Detroit. They traced the cell phones of his accomplices and arrested them at Thomas's house and at another address where the kidnappers kept Blackwell's brother.

While the officers conducted surveillance at the address where the brother was being held, the accomplices—feeling the pressure and unable to contact Thomas as he remained in custody—decided to abandon the plan and release the brother. They sped away from the address with the brother in the back of the car. Drunk and executing several evasive maneuvers, the driver crashed the vehicle. Officers found the brother inside the car, bound and blindfolded. The associates who held Blackwell's sister in Kentucky also gave up soon after they found themselves unable to contact Thomas. They left the sister in a restaurant in Ohio, and she took a taxi back home to Indianapolis.

A federal grand jury indicted Thomas for conspiracy to commit kidnapping and two counts of kidnapping. At trial, virtually every participant and victim testified against Thomas, including Blackwell, her mother, her mother's friend

who was zip-tied, her brother and sister, and Thomas's co-conspirators. The trial testimony contained graphic details related in sometimes colorful language.

The jury convicted Thomas on all charges. At sentencing, the judge adopted the presentence investigation report prepared by the U.S. Probation Office that applied the U.S. Sentencing Guidelines. In calculating Thomas's offense level under the guidelines, the judge determined that the offense involved vulnerable victims and the use of physical restraints. With those enhancements, Thomas's guideline calculation of an offense level 52 was literally off the chart, well above the offense level 43 for which the guideline sentence is life in prison for all six criminal history categories. Without those enhancements, the offense level would have been 48, still off the chart. The court found that the statutory mandatory minimum sentence of twenty years should apply because the kidnapping victims were minors, but that issue was not submitted to the jury. The district court sentenced Thomas to life in prison.

II. *Analysis*

   A. *Evidentiary Rulings on Blackwell's Testimony*

On appeal, Thomas argues first that the district court erred under Federal Rules of Evidence 403 and 404(b) by admitting three statements from Blackwell that referred to other, uncharged allegedly criminal acts by Thomas. First, he points to Blackwell's first meeting with Thomas where, she testified, she "asked him if he wanted his d*** sucked." This, Thomas claims, created an inference that he engaged in improper sexual conduct, including prostitution. Second, Thomas objects to Blackwell's statement that one of his henchmen would do

"whatever Jay told him to do," specifically to "[g]o out and sell drugs, shoot people, steal something." Third, he points to Blackwell's statement that Thomas "beat me up on Valentine's Day," which led to her decision to leave Thomas a few days later.

The first statement drew no objections from the defense. The second and third drew objections. The prosecutor responded to the objections by offering to rephrase the question and to instruct Blackwell to tailor her answers more narrowly. The district judge sustained only the second objection, but his response to both objections was the same: he allowed the prosecution to proceed on its proposed, modified questions.

We ordinarily review a district court's evidentiary rulings on Rule 404(b) for abuse of discretion. *United States v. Curtis*, 781 F.3d 904, 907 (7th Cir. 2015). If a party never objected to the admission of evidence in the district court, we review only for plain error. *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010). To succeed on plain error review, Thomas must show: (1) an error that he has not intentionally waived; (2) that the error was "plain—that is to say, clear or obvious;" (3) that the error affected his substantial rights; and (4) that the error "'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016), citing *United States v. Olano*, 507 U.S. 725, 736 (1993). Where an appellant's objection was *sustained* at trial, with a prosecutor's agreement to rephrase the question, and where the appellant did not promptly ask the district court for a stronger response, we review whether it was plain error for the district court not to provide a stronger remedy on its own initiative. See Fed. R. Crim. P. 52; cf. *Adams*, 628 F.3d at 414.

On appeal, Thomas argues that the district court erred under Federal Rule of Evidence 404(b), which provides that evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The rule is designed to prevent juries from drawing the improper inference from a prior act that the defendant has a propensity to act in a certain way and acted in that way on the particular occasion that is the subject of the trial. *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014) (en banc). The rule, however, does not impose a categorical bar to evidence of other acts. If the evidence serves another purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," then the evidence may be admitted. Fed. R. Evid. 404(b)(2). Even if a piece of evidence is not barred by Rule 404(b), however, courts still must determine that the evidence meets Rule 402's requirement that the evidence be relevant and Rule 403's requirement that its "probative value" not be "substantially outweighed by … unfair prejudice." Fed. R. Evid. 403.

In *United States v. Gomez*, sitting en banc, we laid out the two-step process mandated by the Rules. Upon objection to the introduction to other-act evidence, the proponent must show under Rule 404(b) that the evidence serves another purpose and establish that purpose "through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case." 763 F.3d at 860. If the proponent can do this, the district court must then under Rule 403 "assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair

prejudice" and "take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case." *Id.*

In this case, the defense never objected to the first contested statement, though Thomas's attorney did object to the last two statements, arguing that Blackwell was "nonresponsive" and "offering much more than the answer requires." In those instances the court either sustained the objection or the prosecutor willingly rephrased the question to evade the inflammatory statement. At no time, however, did the defense ask the district court to provide a curative or limiting instruction to the jury to ignore statements made by Blackwell that might run afoul of the Rules. On appeal, Thomas argues that the district court erred by not providing a limiting jury instruction *sua sponte*.[1]

This argument runs contrary to our decision in *Gomez*, where we expressed "caution against judicial freelancing in this area" because "sua sponte limiting instructions … may preempt a defense preference to let the evidence come in without the added emphasis of a limiting instruction." *Gomez*, 763 F.3d at 860. The district court in this case rightly heeded that caution and refrained from judicial freelancing absent specific requests from the defense. Instead, the court responded in the limited way requested, by sustaining objections to evidence when necessary but drawing no additional attention to the matter. By following our approach in *Gomez*,

---

[1] Thomas has not argued that the judge should have declared a mistrial *sua sponte*, and it is doubtful he could have met the high bar for plain-error review for failure to declare a mistrial. See *United States v. Tanner*, 628 F.3d 890, 898–99 (7th Cir. 2010).

the district court did not abuse its discretion, let alone commit plain error.

There is no doubt that Blackwell was a difficult witness for both lawyers and for the judge. The prosecutor prepared Blackwell to testify and warned her against mentioning other acts committed by the defendant. She highlighted for Blackwell those specific acts that should not be repeated in court, namely, instances of domestic violence, including one incident that caused her to suffer a miscarriage, as well as Thomas's violent acts against others, including breaking someone's kneecaps in a drug dispute. In addition to telling Blackwell orally not to mention these other acts, the government had her sign a letter acknowledging these instructions. Blackwell herself remembered the letter and refrained from mentioning a second time the Valentine's Day beating when defense counsel asked the risky question, what "was the deciding factor" in her decision to steal Thomas's property? Blackwell responded, "Gosh. So they made me sign this piece of paper that said I wouldn't talk about that."

Before presenting its case, the government had taken the unusual step of advising the court and defense counsel of its efforts to try to ensure that Blackwell's testimony would comply with the Federal Rules of Evidence, to say nothing of courtroom decorum. The prosecutor frankly admitted her inability to get Blackwell to comply but recounted her many efforts. Here was the prosecutor's unusual statement:

> She is not a cooperating witness. She has absolutely no agreement with the federal authorities. And on top of that, Your Honor, she is not under our control.

The reason I say that, Your Honor, is—Ms. Blackwell is—is someone who, through my preparation of her, I have seen she doesn't mince words. She says whatever she is thinking at that moment. And I have tried, through my preparation, to admonish her on many, many, many subject matters that she is not allowed to bring out in her testimony. I have told her on numerous occasions that she is to only answer the question that either I or the defense attorney asks.

Now, some of the things that Ms. Blackwell has said in her preparation that I have admonished her that she is absolutely not allowed … to say fall into a couple different categories. The first of those categories are prior acts of domestic violence between Ms. Blackwell and the defendant. …

The reason I'm making that clear, Your Honor, is because Ms. Blackwell is certainly not under my control. I have taken as many steps as I can think of to control her before this jury. Not only have I admonished her orally but prior to her testimony, we will be presenting her with a written letter that I've signed … and then we will ask Ms. Blackwell to sign that memorializes in writing that we have told her she is not allowed to bring up those instances.

And I just wanted to put all that on the record, Judge, because I have to tell you, if I can speak plainly, I've been doing this eight or nine years.

> I've put so many different kinds of witnesses on
> the stand. She is a first for me. She is someone
> as unwieldy as it gets. So I wanted to make it
> absolutely clear to this Court the steps I have
> taken to control her.

Despite these precautions, Blackwell did not comply with the prosecutor's instructions.

The government does not choose the principal players involved in serious crimes like this, and it must make its best effort to present its evidence according to law. It is hard to imagine what else the government could have done with Blackwell. She and her relationship with Thomas were at the heart of the kidnapping case.

Blackwell's refusal to comply with warnings and instructions, and her colloquial and often obscene language, presented a serious challenge for the government to present its case without unfair prejudice to Thomas. Much of the testimony was graphic because of the nature of the events and Thomas's crimes. The government took reasonable measures to minimize the risks of unfair prejudice. Despite those efforts, Blackwell strayed a few times. When she did, the judge took appropriate action, and the defense did not ask him to do more. We do not see any error, let alone plain error. Further restrictions could have made the trial of these events too stilted and artificial—the judicial equivalent of editing a Quentin Tarantino movie to air on the Disney Channel. Federal law and the Rules of Evidence do not require that. And given the mountain of evidence against Thomas, we cannot imagine that the three incidents Thomas challenges on appeal had any effect on the ultimate verdicts.

B.  *Admission of Cell Phone Location Data*

Thomas argues next that the government's collection of his cell phones' location information without a search warrant violated the Fourth Amendment. Under Federal Rule of Criminal Procedure 12(b)(3)(C), a defendant who believes the government obtained evidence by violating the Fourth Amendment's prohibition on unreasonable searches and seizures must move before trial to suppress that evidence. Under Rule 12(c)(3), a court may consider untimely motions if the defendant can show good cause. In this case, Thomas never moved to suppress the evidence, never attempted to show good cause for this failure in the district court, and did not object to admission of the evidence at trial. He argues on appeal, however, that the district court still erred in admitting the evidence. Under our precedents, this argument calls for us to answer the somewhat roundabout question: whether the district court would have abused its discretion if it had concluded that Thomas lacked good cause. See *United States v. Acox*, 595 F.3d 729, 732 (7th Cir. 2010).

The cell-site location information pinned Thomas and his accomplice at specific locations during the kidnapping. The government obtained this information pursuant to the Stored Communications Act, 18 U.S.C. § 2701 et seq., but without a search warrant. Thomas argues that the government's collection of his cell phone location information without a warrant violated the Fourth Amendment. As good cause for his failure to follow the required procedure, he cites "the legal ambiguity surrounding" the use of "historical cell-site location information." At the time of his trial, a circuit split existed on this precise issue, one we acknowledged in *United States v. Daniels*, 803 F.3d 335, 351 (7th Cir. 2015). Shortly before Thomas's trial,

the Sixth Circuit decided *United States v. Carpenter*, 819 F.3d 880, 890 (6th Cir. 2016), finding no constitutional violation in obtaining cell-site data without a warrant. The rule stated in *Carpenter* remained uncertain throughout Thomas's trial and appeal as the Supreme Court granted certiorari and later reversed *Carpenter*. See *Carpenter v. United States*, 137 S. Ct. 2211 (2017) (granting certiorari); 138 S. Ct. 2206 (2018) (reversing on merits because search warrant was required).

While Thomas certainly is correct that this legal issue remained uncertain before his trial, that uncertainty did not qualify as good cause under Rule 12 for failing to raise the issue. We have trouble seeing how a circuit split on such a high-profile issue can provide good cause for failing to raise the issue in the district court. In *Daniels*, we rejected a similar challenge to the use of cell data because the defendant failed to file the required pretrial motion. The defendant in that case could not show good cause because the "defendants knew all they needed to know in order to make the Fourth Amendment argument" before this court. *Daniels*, 803 F.3d at 352**.** Following *Daniels*, we find that the district court would not have abused its discretion if it had found no good cause for failing to file a timely motion. In other words, though the Supreme Court's *Carpenter* decision indicates a potential Fourth Amendment problem with the cell-site data used here, Thomas cannot raise this argument now, after failing to raise it in the district court.[2]

---

[2] In *Carpenter*, the Supreme Court reversed the Sixth Circuit, holding that the collection of cell-site location information can be, and was in that case, "a search within the meaning of the Fourth Amendment." *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018). We need not and do not address here the scope of the Court's decision in *Carpenter*. See *id*. at 2217 n.3

C.  *Sentencing Guideline Issues: Vulnerable Victims and Re-*
    *straint of Victims*

Thomas next argues that the district court made two errors
in calculating his offense level under the Sentencing Guide-
lines. The court found that Thomas was in criminal history
category V and that his total offense level was 52, which was
literally off the chart. In rare cases like this one, the offense
level will exceed the maximum offense level of 43 listed on the
guideline sentencing chart. When that happens, the "offense
level of more than 43 is to be treated as an offense level of 43,"
which recommends a life sentence for all criminal history cat-
egories. U.S.S.G. § 5A cmt. 2.

The district court grouped Thomas's convictions into two
groups, one for kidnapping and conspiracy to kidnap Black-
well's brother, and the other for kidnapping and conspiracy
to kidnap her sister. The district court's offense calculation be-
gan with a base offense level of 32 for kidnapping under
U.S.S.G. § 2A4.1 for the kidnapping of Blackwell's brother.
The court added a total of eighteen points under offense level
adjustments because the crime involved a demand for a ran-
som, use of a dangerous weapon, physical restraint of a vic-
tim, a vulnerable victim, and obstruction of justice, and be-
cause Thomas was the leader of the criminal activity. An ad-
ditional two points were added to account for the separate
group of counts for kidnapping Blackwell's sister. Taking the
greater of the two groups and adding the multiple-count ad-
justment, Thomas's total offense level hit 52.

---

(disclaiming any decision on scope of Fourth Amendment protections for
less than seven days' worth of information).

Thomas challenges on appeal the two-level enhancements for vulnerable victims under § 3A1.1 and for restraint of a victim under § 3A1.3. He did not raise either issue in the district court, so we review for plain error. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018); *Molina-Martinez v. United States*, 136 S. Ct. at 1343; *United States v. Olano*, 507 U.S. 725, 733–34, 736 (1993).

Starting with the vulnerable-victim enhancement in § 3A1.1, Thomas argues it amounted to double-counting because he was convicted of kidnapping two minors, who are deemed vulnerable victims. We do not see any error in this enhancement, let alone a plain one. The kidnapping guideline, § 2A4.1, applies generally to all kidnappings. No other offense characteristic that was applied under the Guidelines accounted for the victims' ages or vulnerability.

The restraint-of-victim enhancement of § 3A1.3 is more of a problem. Application Note 2 to § 3A1.3 instructs that this enhancement simply does not apply to offenses covered by § 2A4.1, including kidnapping. The reason is that restraint of a victim is an element of the offense and is already accounted for in the base offense level. We agree with Thomas that this was an error, but we find no plain error requiring a remand.[3]

---

[3] If this issue had been raised with the district court, there might well have been grounds for a departure or a variance on this issue based on the use of the zip-ties to restrain the man who was in the house during the kidnapping of Blackwell's younger brother and sister. The court might reasonably have considered that additional restraint of a bystander as beyond the intended scope of Application Note 2. Perhaps that was the probation officer's view. The PSR applied the enhancement because the "victim was physically restrained with zip ties," but the government has not pursued this possibility on appeal.

In *Molina-Martinez*, the Supreme Court addressed plain errors in guideline calculations. The Court made clear that most guideline errors, even if not raised in the district court, will satisfy the criteria for a plain error because there is a reasonable probability of a different outcome. 136 S. Ct. at 1346. The Court there rejected a categorical rule (applied by one circuit) that a guideline error was not plain if the actual sentence imposed was within the correct range. See *id.* at 1345. More recently, in *Rosales-Mireles*, the Court applied the fourth element of the plain-error standard in a way that shows most guideline errors will require a remand. 138 S. Ct. at 1908.

Both *Molina-Martinez* and *Rosales-Mireles* frame their holdings in terms of "most" cases, and both decisions recognize that there may be circumstances where a guideline error will not affect the ultimate sentence. *Molina-Martinez*, 136 S. Ct. at 1346; *Rosales-Mireles*, 138 S. Ct. at 1909–10. In one category of those cases, the sentencing judge makes clear that the defendant's sentence simply does not depend on the resolution of a guideline issue. See, e.g., *United States v. Marks*, 864 F.3d 575, 576 (7th Cir. 2017) ("when an arcane and arbitrary issue arises under the Sentencing Guidelines, the sentencing judge should ask, 'Why should I care?'"); *United States v. Minhas*, 850 F.3d 873, 879–880 (7th Cir. 2017) ("Procedural errors do not warrant remand when we are convinced that returning the case to the district court would result in the same sentence."), citing *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009).

---

The government's contention on appeal that the victim-restraint enhancement was available here because it applied to the conspiracy charge is not persuasive. The presentence investigation report used kidnapping as the base offense under § 2A4.1(a).

Second, a guideline error that does not actually affect the
final guideline range calculated by the court falls outside the
general rule of *Molina-Martinez* and *Rosales-Mireles*. Both
opinions are framed in terms of whether the final "range" is
correct or not, and not on whether there might be errors that
do not affect the final range. See *Molina-Martinez*, 136 S. Ct. at
1345–46, 1348–49; *Rosales-Mireles*, 138 S. Ct. at 1903. In this
case, a two-level error in the offense level would not have
changed the final recommended guideline range. The range
still would have been life in prison. The error on the restraint-
of-victim adjustment therefore did not affect Thomas's sub-
stantial rights or undermine confidence in the proceedings
and their final result. See *United States v. Fletcher*, 763 F.3d 711,
718 (7th Cir. 2014) (error in guideline calculation was harm-
less; statutory maximum would have governed under both
correct and incorrect calculations, so correct guideline range
would have been exactly the same); *United States v. Anderson*,
517 F.3d 953, 965–66 (7th Cir. 2008) (guideline error harmless
where correct guideline range on remand would be exactly
the same as range that district court calculated).

In addition, Judge Young made clear at sentencing that the
life sentence he imposed was driven by his overall assessment
of the sentencing factors under 18 U.S.C. § 3553(a). He consid-
ered Thomas's personal characteristics, noting that Thomas
engaged in illegal activity "all his life and admits that. He has
no other employment history." The judge noted in particular
the terrible nature of the crime, saying, "These young chil-
dren, I'm sure, were terrified. They had to be … taken in the
middle of the night by strangers, armed, threatening, to a
place where they didn't have any idea where they were going
or whether they would remain alive." He also noted the im-
portance of protecting the public from Thomas's future

crimes, stating that if he were released, "these young victims will still be alive. And will they have to be constantly looking over their shoulder if the defendant is released?" There is no need to remand for resentencing on a slightly different guideline calculation that would still result in a recommended range of life in prison.

D. *The Alleyne Error on Ages of Victims*

In *Alleyne v. United States*, 570 U.S. 99 (2013), the Supreme Court held that "any fact that increases the mandatory minimum" sentence under a criminal statute is an element of the crime "that must be submitted to the jury." *Id.* at 103. The federal kidnapping statute mandates that if the victim "has not attained the age of eighteen years," the sentence "shall include imprisonment for not less than 20 years" if the offender is over eighteen and not a close relative or person with custody rights. 18 U.S.C. § 1201(g)(1). To apply the mandatory minimum, therefore, the defendant must admit or the jury must find beyond a reasonable doubt that at least one of the victims of the offense was younger than 18.

Thomas argues on appeal that the district court made an *Alleyne* error by not submitting the age issue to the jury. He is correct, but his counsel did not object to the verdict form or otherwise raise this issue in the district court. Because Thomas forfeited this argument, we will reverse the district court only if, again, he can establish plain error. See *United States v. Cotton*, 535 U.S. 625, 631 (2002); *United States v. Long*, 748 F.3d 322, 330 (7th Cir. 2014) (plain error review for forfeited *Alleyne* error); see also Fed. R. Crim. P. 52(b).

To succeed on plain error review, again, Thomas must show (1) an error that he has not intentionally waived; (2) that

the error was "plain—that is to say, clear or obvious;" (3) that the error affected his substantial rights; and (4) that the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Molina-Martinez*, 136 S. Ct. at 1343; *Olano*, 507 U.S. at 733–34, 736. In this case, the *Alleyne* error was not waived, and it was plain. Counsel on both sides just missed it at trial and sentencing. But this error also fails to satisfy the third and fourth elements of the plain-error standard. We are confident the error did not affect Thomas's substantial rights and did not undermine the fairness, integrity, or public reputation of the judicial proceedings. See *Olano*, 507 U.S. at 737 (error did not affect substantial rights because it was not prejudicial).

The only place the ages of the kidnapping victims affected the guideline range was in the two-level enhancement for vulnerable victims, which was not erroneous and did not affect the ultimate sentence. And in the face of the off-the-charts guideline recommendation for life sentence and the district judge's explanation at sentencing, we are confident that the 20-year mandatory minimum sentence was so far below the guideline recommendation of life and the actual sentence of life that it had no effect on the sentence.

In addition, *Alleyne* and *Apprendi* errors do not amount to plain error where the evidence on the issue at trial was "'overwhelming' and 'essentially uncontroverted.'" *Cotton*, 535 U.S. at 633, quoting *Johnson v. United States*, 520 U.S. 461, 470 (1997); *Long*, 748 F.3d at 329; *United States v. Kirklin*, 727 F.3d 711, 718 (7th Cir. 2013). In this case, the government presented overwhelming and uncontroverted evidence that the kidnapping victims were minors. Blackwell's brother and sister both testified at trial. During their testimony, her brother and sister

gave their ages, which were 17 and 15 on the day of testimony. Not surprisingly, the defense made no effort to contradict or undermine this testimony. No other witness gave contradictory testimony about their ages. The evidence at trial would have compelled the finding that the victims were minors, so the *Alleyne* error was not a "plain error" requiring a remand. See *Long*, 748 F.3d at 330–32 (*Alleyne* errors did not satisfy plain-error standard where there was "no real possibility" that a jury would have failed to make required findings).

The judgment of the district court is

AFFIRMED.