In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2803

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL S. BARBER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:17-CR-67(1) — **Robert L. Miller**, **Jr.**, *Judge.*

ARGUED MAY 15, 2019 — DECIDED AUGUST 27, 2019

Before WOOD, *Chief Judge*, and EASTERBROOK and
HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. On the evening of February 9, 2017,
Michael Barber and his friend Anthony Chipps used a crow-
bar to break into Dutchman Hunting Supplies in Shipshe-
wana, Indiana, and steal 15 handguns. The authorities had lit-
tle trouble nabbing them: they set off the alarm during the
robbery, and they were easily identified by shop employees,
because they had scouted out Dutchman earlier that same

day. On top of that, Barber was foolish enough to discuss the robbery on Facebook Messenger.

In due course, Barber was indicted on charges of stealing firearms from a federally licensed firearms dealer, possessing firearms as a felon, and possessing stolen firearms. See 18 U.S.C. §§ 922(u), (g)(1), and (j). Chipps decided to cooperate with the government and testified at trial against Barber. In addition, the government introduced both the Facebook messages and cell-location data for Barber's phone. The latter evidence put him near Dutchman at the time of the robbery. The jury convicted him on all charges, and the court then sentenced him to 210 months' imprisonment. That sentence reflected a two-level enhancement in his offense level for obstruction of justice.

Barber appeals both his conviction and sentence. He argues that the district court should not have admitted the Facebook records, cell-location data, and a certificate indicating that Dutchman had a firearms license. He also contends that his advisory sentencing guidelines should not have included the obstruction enhancement. Finding no reversible error, we affirm.

**I**

We begin with the evidence presented at trial. Rule 103(a)(1) of the Federal Rules of Evidence requires litigants to make their objections to evidence at trial specific and timely. Where Barber followed this command, we review the district court's rulings for abuse of discretion. We disregard any error that was harmless. See FED. R. CRIM. P. 52(a); *United States v. Boone*, 628 F.3d 927, 932 (7th Cir. 2010). We review points that

he raises for the first time on appeal for plain error, at best. See FED. R. CRIM. P. 52(b).

A

Barber first objects to the admission of the evidence the government used to prove that the dealer from whom he stole the guns was federally licensed. It submitted Dutchman's license, or "Blue Ribbon Certificate," along with accompanying authenticating documents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Those documents included a License Registration Report, which shows the date the license was issued, expiration date, and its status as active, as well as two signed statements from ATF officials representing that Dutchman was licensed during the period when the robbery took place. None of those officials appeared at trial. Barber objected to this evidence at trial, claiming that the statements from the ATF officials are testimonial under the line of cases beginning with *Crawford v. Washington*, 541 U.S. 36, 50 (2004). See *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011). Barber argues that his inability to cross-examine the agents violated his Sixth Amendment right to confrontation. He renews this objection on appeal; our review is for abuse of discretion.

In *Melendez-Diaz*, the Supreme Court addressed the line between regularly-kept records that are admissible without testimony from a custodian, and evidence that is admissible under the Confrontation Clause only if the creator of the document testifies. 557 U.S. at 321–23. At issue there were certificates reporting the results of testing that some forensic analysts had conducted on evidence. When the defendant objected to the admission of those certificates without affording him the opportunity to cross-examine the analysts, the

government countered that the certificates were not testimonial for Sixth Amendment purposes. The Supreme Court sided with the defendant, and in so doing discussed what it takes to make a record (or statements about it) "testimonial."

The *Melendez-Diaz* Court considered and rejected the argument that the analysts' certificates should be treated in the same way as "a clerk's certificate authenticating an official record—or a copy thereof—for use as evidence," and thus be admitted without a live witness. *Id.* at 322. In doing so, the Court emphasized that the analysts' work creating a record was quite different from the clerk's narrow role in authenticating a copy of a record. While a clerk, the Court said, was "permitted 'to certify to the correctness of a copy of a record kept in his office,' [he] had 'no authority to furnish, as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows, or to certify to its substance or effect.'" *Id.* (quoting *State v. Wilson*, 141 La. 404, 409 (1917)).

The Supreme Court returned to this issue in *Bullcoming*, where the question presented was whether "the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." 564 U.S. at 652. Emphasizing that the report (a blood-alcohol test) contained more than a simple transcription of a machine-generated number, and noting that the state had made no effort to show why the analyst who performed the test was unavailable (not to mention that the defendant had not had an opportunity to cross-examine that analyst), the Court held that the defendant's Sixth Amendment confrontation rights

had been violated. *Id.* at 663. Although there was disagreement among the Justices about the limits of this rule—in particular, over when testimony from a supervisor ought to suffice for confrontation purposes—the facts of our case do not raise that problem. See *id.* at 674–84 (Kennedy, J., dissenting); see also *id.* at 672–73 (Sotomayor, J., concurring).

We do not need to sort out all of the implications of the separate opinions and votes in *Bullcoming* for present purposes. It is enough to say that no such resolution can help Barber. In his case, the affidavits from the ATF officials suffer from the same infirmity as the analysts' certificates in *Melendez-Diaz* and the blood-test results in *Bullcoming*. Relevant to *Melendez-Diaz*, they go beyond simple authentication of a copy. The ATF agents' affidavits explain the purpose of the records and interpret them as proof that these are the records used for firearm licenses and that Dutchman was licensed during the relevant period. Those statements rest on an inference about the *continuing validity* of the license, and that inference requires an interpretation of what the record shows or a certification about its substance or effect. In other words, the government is relying on information beyond what the license itself says. For example, the affidavit could imply that ATF has a practice of documenting on its copy of a license information about suspensions (if any), or it might suggest that the affiant agent ran a search in order to confirm that Dutchman did not have a licensing issue at the time of the robbery. Defense counsel is entitled to know about and challenge whatever process went into generating this type of evidence. Relevant to *Bullcoming*, the government did not offer a supervisor or other responsible official for cross-examination.

This leaves us with a scenario very like one that the *Melendez-Diaz* Court discussed:

> Far more probative here are those cases in which the prosecution sought to admit into evidence a clerk's certificate attesting to the fact that the clerk had searched for a particular relevant record and failed to find it. Like the testimony of the analysts in this case, the clerk's statement would serve as substantive evidence against the defendant whose guilt depended on the nonexistence of the record for which the clerk searched. Although the clerk's certificate would qualify as an official record … —it was prepared by a public officer in the regular course of his official duties— … the clerk was nonetheless subject to confrontation.

557 U.S. at 323. The License Registration Report, a database search-result page dated just days before the lawsuit was filed, is exactly the kind of search the Court was talking about in the quoted passage. It sheds light on the status of Dutchman's license. *Melendez-Diaz* tells us that the defendant had the right to confront the ATF officials, in order to understand and question the evidence they provided. We thus conclude that the district court erred when it admitted the ATF records without requiring testimony from the responsible officials.

Even if it was error to admit these records, Barber does not automatically prevail. We must decide whether any such error was prejudicial or harmless. In a Confrontation Clause case, the harmless-error inquiry rests on a variety of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the

extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011). Barber is correct that the government was required to prove that Dutchman was licensed, in order to support one of his convictions. Even without the "Blue Ribbon Certificate," however, there was another copy of the license properly in evidence before the jury: the one identified by the owner of Dutchman. This copy of the license is signed, has the license number, and shows a clear expiration date. The owner's testimony at trial confirmed the authenticity of the copy he introduced, his continuous possession of it, and that the license was valid during the robbery. Given the existence of this evidence, any error in admitting the ATF records was harmless. We note as well that if one were to read *Bullcoming* as being more hospitable to the admission of this kind of government record, Barber is no better off. If that were the case, he might well not be able to show error at all.

B

Barber also argues that it was error to admit Facebook records linked to an account that he says is not his—or, more accurately, that the government allegedly failed to prove is his. On the second day of trial, the government brought in the Facebook records for use in its examination of ATF Special Agent Thomas Kaiser, a digital-media collection specialist who investigated Barber and originally discovered the Facebook account. Kaiser testified that the Facebook account in question was "friends" with many of Barber's known friends, had pictures of him, and was linked to a cell phone number Barber had given out.

Jeremiah Thompson, the friend with whom Barber discussed the robbery on Facebook Messenger, also testified about the records. Thompson confirmed his knowledge of those messages, that he recognized the pictures of Barber from the account in question, and that he habitually used Facebook Messenger to coordinate in-person meetings with Barber. After this testimony, the government moved to admit the Facebook records as adequately authenticated under Federal Rule of Evidence 901(b)(1). Barber objected on the grounds that the government had not laid a sufficient foundation establishing that the account was his. Since he renews this argument on appeal, we review for abuse of discretion.

To authenticate Facebook records and messages, the government needed only to "produce evidence sufficient to support a finding" that the account belonged to Barber and the linked messages were actually sent and received by him. FED. R. EVID. 901(a). See *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016). Barber relies on two cases from the Second and Third Circuits to support his contention that the government's foundation was inadequate. Neither helps him.

In the first case, *United States v. Vayner*, 769 F.3d 125, 131 (2d Cir. 2014), the government's case was so weak that at first it did not even try to admit the website at issue as the defendant's. When it did try, the government could point to nothing in the record suggesting that the defendant had ties to the website. *Id.* at 132–33. In contrast, in our case ample evidence tied Barber to the Facebook account. Next, Barber relies on *United States v. Browne*, 834 F.3d 403, 409 (3d Cir. 2016). There, the government initially tried to introduce Facebook messages as self-authenticating evidence under Federal Rules of Evidence 902(11) and 803(6). *Id.* When that failed, it offered

testimony from a records custodian, who said that the Facebook messages were sent between the accounts. That fact, however, shed no light on whether those accounts were tied to any particular people. *Id.* at 409–10.

Even though the Facebook records were not self-authenticating under Rule 902, however, the *Browne* court held that the government had properly authenticated the documents under Rule 901. It found that the "authentication challenge collapses under the veritable mountain of evidence linking" the defendant to the incriminating Facebook chats. *Id.* at 415. Some of the evidence on which the court in *Browne* relied came from four witnesses who had participated in the Facebook messages at issue. Though those witnesses did not specifically identify the records at trial, their testimony about the conversations was consistent with the records. They said, for example, that after arranging a meeting via messages with the account at issue, they would meet in person with the defendant. The Third Circuit called this "powerful evidence not only establishing the accuracy of the chat logs but also linking them to Browne." *Id.* at 413. Here, we have that and more. Thompson testified that he would meet with Barber after messaging the account, and he directly identified the pertinent messages.

This court has relied on evidence such as the presence of a nickname, date of birth, address, email address, and photos on someone's Facebook page as circumstantial evidence that a page might belong to that person. *Lewisbey*, 843 F.3d at 658. Barber had all of that and more. In addition, Barber's account was linked to his girlfriend's, linked to his cell phone, and—most damning given *Browne*—Thompson testified that he successfully used Facebook Messenger to set up face-to-face

meetings with Barber. That is more than enough for a reasonable jury to conclude that the account belonged to Barber. There was no error in admitting these Facebook records.

C

Just 44 days after Barber's May 2018 trial, the Supreme Court decided *Carpenter v. United States*, which held that the government must obtain a search warrant before gathering cell phone location data. 138 S. Ct. 2206, 2221 (2018). The police did not have a warrant when they obtained Barber's data from his carrier. Armed with the Court's *Carpenter* decision, Barber contends that his records should be suppressed. But Barber did not raise this objection at trial; indeed, he did not even file a pre-trial motion to suppress the data. This has serious implications for his ability now to raise the point.

Federal Rule of Criminal Procedure 12(b)(3) describes suppression motions as "requests [that] must be raised by pretrial motion if the basis for the motion is then reasonably available." Rule 12(c)(3) specifies that if a party misses the deadline for a pretrial motion under Rule 12(b)(3), the motion is untimely and the court may consider it only if the party shows "good cause." While *Carpenter* was decided after Barber's trial, the case had been pending before the Supreme Court since June 5, 2017, when the Court agreed to hear it. See *Carpenter v. United States*, 137 S. Ct. 2211 (2017) (granting certiorari). The issue was thus hardly a secret: Barber's lawyers could easily have adopted the arguments Carpenter's lawyers were making in a similar suppression motion.

We confronted precisely this question in *United States v. Thomas*, 897 F.3d 807, 815 (7th Cir. 2018), cert. denied, 139 S. Ct. 615 (2018). The defendant in *Thomas* also had his cell

location records obtained without a warrant. Like Barber, he did not file a suppression motion just before *Carpenter* was decided, nor did he show good cause for why he failed to do so. We held that "[w]hile Thomas certainly is correct that this legal issue remained uncertain before his trial, that uncertainty did not qualify as good cause under Rule 12 for failing to raise the issue." *Id.* We pointed out that in our court's last word on the topic, *United States v. Daniels*, 803 F.3d 335, 351 (7th Cir. 2015), we did not reach the substantive suppression issue—though we explicitly noted the circuit split that *Carpenter* would resolve—because the defendant likewise failed to file a pretrial motion to suppress. *Id.*

Barber, like Daniels and Thomas, knew that this was an open question, yet he failed to file the required suppression motion. *Daniels* especially ought to have alerted him to both the availability of the *Carpenter* argument and the necessity of making the pretrial suppression motion. We conclude that Barber has not shown good cause for why we should consider his untimely motion under Rule 12(c)(3), and so he has forfeited this argument. His failure to show good cause also persuades us that there is no reason to overlook his forfeiture.

## II

We end with a brief note on Barber's sentence. During his trial, U.S. Marshals found a message scratched on a bench where Barber had been sitting in the South Bend federal courthouse. It read: "TELL ANTHONY CHIPPS TO THINK B4 H GET ON THERE N LIE." Based on this, the district court imposed a two-level sentencing enhancement for obstruction of justice.

The relevant sentencing guideline states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. Obstructive conduct includes but is not limited to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness … directly or indirectly, or attempting to do so[.]" *Id.* at § 3C1.1 comment n.4(A). We review the district court's underlying factual findings that supported this sentencing guideline enhancement for clear error, and we consider *de novo* whether the district court made adequate findings. *United States v. House*, 551 F.3d 694, 697 (7th Cir. 2008).

An attempt to influence a witness is enough, regardless of whether it succeeds. *United States v. Wright*, 37 F.3d 358, 362 (7th Cir. 1994). And it is the defendant's actions that matter: "the court will use an objective standard to determine whether a given action is an attempt to obstruct justice, rather than evaluating the subjective intent of the defendant." *House*, 551 F.3d at 699. The context of the statements is important. *Wright*, 37 F.3d at 362; *United States v. Cherif*, 943 F.2d 692, 703 (7th Cir. 1991) (letter saying, "You know you're innocent and there is no way conceivable that you could have known anything about anything" was obstruction because it was a lie, and thus an attempt to influence the witness not to disclose what she knew).

Barber's argument is that his comments do not support an enhancement for obstruction of justice because, if anything, they just encouraged Chipps to tell the truth. In *United States v. Cheek*, 740 F.3d 440, 454 (7th Cir. 2014), we rejected a defendant's similar argument that a letter urging a witness to "tell the truth" was not obstructive, because in context it was reasonably seen as an attempt to sway or prevent harmful testimony. While Barber's interpretation that this was just a statement he made out of concern that Chipps might perjure himself is possible, it is much less likely than the reading that he wanted to communicate his dissatisfaction with his co-conspirator's decision to testify against him. Moreover, telling Chipps to "think b4" he spoke is phrasing commonly used for one thing: to cause someone to reconsider what he is about to do, and then not do it. See, *e.g.*, *Think Before You Post: Hoax Threats are Serious Federal Crimes*, FBI, (Oct. 5, 2018) https://www.fbi.gov/news/stories/hoax-threats-awareness-100518 (advising the public of the potential criminal consequences for sending threatening social media posts, including a video described as "[t]his college student realized the gravity of his threatening post when the FBI arrested him"). We see no error in the district court's factual determination—specifically its analysis of the context of the statement and the likely interpretation of the statement itself—that Barber's conduct warranted the sentencing enhancement.

## III

We AFFIRM Barber's conviction and sentence.