2025 UT App 50

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RODD ADAM REPSHER,
Appellant.

Opinion
No. 20220980-CA
Filed April 10, 2025

Eighth District Court, Vernal Department
The Honorable Clark A. McClellan
No. 191800811

Freyja Johnson and Hannah Leavitt-Howell,
Attorneys for Appellant

Derek E. Brown and Andrew Peterson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      A jury convicted Rodd Adam Repsher—a high school teacher—of various sexual crimes related to actions he took toward a minor student. He appeals his convictions, asserting that the trial court improperly admitted certain electronic messages into evidence and that his trial counsel rendered constitutionally ineffective assistance. We reject Repsher's arguments and affirm his convictions.

BACKGROUND[1]

¶2     Repsher was the health teacher at Uintah High School in Vernal, Utah. He was relatively young, for a teacher, and he developed a reputation for being one of the "cooler teachers." In some ways, Repsher was less formal with students than other teachers were, and this was purposeful—he testified that he was attempting "to give the misfits of the school a place to be." For instance, he allowed students to hang out in his classroom throughout the day, before and after school, sit on his desk, listen to music or watch movies, and use swear words. He was also one of the school staff members involved with a support group known as the "Hope Squad," which was designed to offer "suicide and self-harm prevention" support for struggling students. In this way, Repsher developed a rapport with many of the students; some felt they could "go to him with anything" and that they could "vent" to him or confide in him about personal matters and family problems. One student described him as "very relaxed, very approachable, just someone you could talk to."

¶3     But this behavior raised red flags with the school's principal (Principal) and faculty members. After receiving initial reports about Repsher's interactions with some of his students, Principal warned Repsher to set more appropriate boundaries.

¶4     One of Repsher's students was Lisa,[2] who was a fifteen-year-old sophomore when the two first met. Lisa and Repsher became close; she spent considerable time in his classroom, and

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up). In so doing, "we present conflicting evidence only when necessary to understand issues raised on appeal." *Id.* (cleaned up).

2. A pseudonym.

she confided in him about "mental health issues" and problems she was having both in school and at home. As their relationship deepened, they communicated often via email, sometimes late at night. Lisa also frequently visited Repsher at a bike shop where he sometimes worked as a second job. In their conversations, Repsher assured Lisa that "he was there for [her], he was going to take care of [her], and that [she] didn't have anything to worry about." In time, Lisa came to view Repsher as her "savior."

¶5     Repsher first kissed Lisa on her sixteenth birthday, toward the end of her sophomore year, at the bike shop. Over the ensuing months, as Lisa entered her junior year, the relationship grew more intimate, involving "inappropriate touching" of Lisa's breasts and buttocks and, eventually, oral sex. Lisa testified that, throughout her junior year, Repsher performed oral sex on her and she performed it on him, on multiple occasions, and that these events occurred in Repsher's classroom, in the garage at his house, and in the bike shop. Repsher discussed with Lisa the possibility of having sexual intercourse, but they ultimately decided against it because Lisa "wanted to wait until [she] was 18" and Repsher was concerned about Lisa becoming pregnant. The two of them also discussed "running away together" and living in another town where nobody knew their "background." During these discussions, Repsher assured Lisa that "age is just a number and that nobody understood that what [they] had was real and there wasn't anything wrong with it."

¶6     During Lisa's junior year, reports reached Principal about "girls draping themselves on" Repsher's desk. Principal documented these reports, told Repsher that she was "worried for" him and about "how it looks," and asked Repsher to "put an invisible line around his desk and set some parameters." At this point, Repsher created a physical boundary around his desk using Velcro and told students not to cross the line.

¶7     A few months later, toward the end of Lisa's junior year, Repsher was briefly placed on administrative leave while

additional similar reports were investigated. During the investigation, a police officer interviewed Lisa and asked her if Repsher had ever acted inappropriately with her, and Lisa denied that anything untoward had occurred. Lisa later testified that her statements to the officer were untruthful and that she had "lied" to protect Repsher. The investigation yielded no definitive evidence of inappropriate behavior, and Repsher was allowed to return to work after a few days.

¶8     Lisa didn't tell anyone about her relationship with Repsher until the summer after her junior year. One evening that summer, Lisa met two of her friends—Alana and Stacie[3]—at a park and disclosed to them that she and Repsher were in a "relationship" and that they had done "physical stuff" together, including oral sex. Later that same night, Lisa, Alana, and Stacie continued this conversation via group chat on Facebook's messaging app. In those messages, Lisa said that she had been "in a lot of pain over this," in part because she "had to go through all of this alone" and without anyone else knowing. Alana told Lisa, "You at least need to tell him that we know." The next day, Lisa messaged Stacie and Alana in the group chat: "He knows that you guys know. He isn't very angry but really scared? He's worried about trusting you guys with knowing." Stacie asked, "Why? Does he think we're going to tell someone?," and Lisa responded, "No he's . . . concerned and worried. He wanted me to emphasize how important it is to not tell anyone, like it's not just about losing his job but he'd be taken to jail for at least seven years." Lisa continued, "He told me that he's serious about us. He plans on breaking up with [his adult girlfriend] after this last year of teaching and then he wants to move to Seattle or Oregon and he said that if I wanted to that he'd take me with him."

¶9     Alana, who considered Repsher a friend, called Repsher to see if what Lisa had told them was true. Repsher asked to meet Alana in person, and at the meeting he confirmed that what Lisa

_____

3. Pseudonyms.

said was true; Repsher told Alana that he would tell others about the relationship after Lisa graduated and that he wanted to wait until then because it was "obviously . . . very dangerous." Later that night, Lisa and Alana walked to Repsher's house, where Repsher said, "Well, now that everything is out in the open, there's something I want to say," and he then proceeded to kiss Lisa in front of Alana.

¶10 A few months later, during October of Lisa's senior year, two of Repsher's colleagues noticed behavior between Lisa and Repsher that they considered unusual. One Friday evening, several hours after school had ended, another teacher (English Teacher) was walking the halls of the school when she saw Repsher open his classroom door from the inside, look down the hall, and then motion with his hand for someone to exit the classroom. English Teacher then saw Lisa exit the classroom; Lisa wasn't wearing shoes. English Teacher had a "bad feeling" about the incident and reported it to Principal.

¶11 Just a few days later, Repsher's close friend and fellow faculty member (Spanish Teacher) saw Repsher and Lisa together in Repsher's classroom. This incident also occurred in the late afternoon, more than an hour after school had ended for the day. Spanish Teacher went to Repsher's classroom to share something with him, and he saw Lisa sitting on top of a counter and Repsher "pressed up" against her. Lisa's "legs were basically around" Repsher, and he had "his arms around her." Spanish Teacher could not see their faces, so he could not tell if they were kissing, but he stated that "they could have been." Spanish Teacher also could not see their hands, so he could not tell what, if any, touching was occurring. But he observed that "they were extremely close," and he knew that "there was no reason that [a teacher] should ever be that close to a student." It was "obvious" to Spanish Teacher that he had "seen something bad" and that Repsher was "doing something extremely inappropriate." Indeed, Lisa later testified that she and Repsher were kissing and that her "hand was in Repsher's pants, on his penis."

¶12    Spanish Teacher was "startled" by what he saw, and he "turned and walked out of the classroom." But Repsher called after Spanish Teacher, eager to discuss the matter and "to try to calm the situation down." The two friends made "extremely awkward small talk" for a few minutes before Spanish Teacher "left and went home." About ten minutes later, Repsher showed up at Spanish Teacher's house to discuss the situation further. Over the course of an hour-long conversation, Repsher explained to Spanish Teacher that "he was in a true relationship with" Lisa, that he no longer had feelings for his current adult girlfriend, and that he planned to leave town with Lisa after she graduated. In an effort to persuade Spanish Teacher not to report the incident to Principal, Repsher told Spanish Teacher that he had "real feelings" for Lisa, that "love is love," and that "age doesn't matter." Spanish Teacher told Repsher that he was obligated to report the incident, and Repsher responded by stating that he would simply "lie" to investigators.

¶13    The next day, Spanish Teacher reported the incident to Principal, as well as what Repsher had told him afterward. But Repsher told Principal a different story: he claimed that Lisa had been having a bad day and had asked for a hug of comfort, and that he had given her one. He indicated that Spanish Teacher had simply happened to walk in at an inopportune time and had "gotten the wrong impression." Principal initiated an investigation, and she placed Repsher on administrative leave. Lisa was interviewed again, and again she denied that anything inappropriate had occurred with Repsher. Lisa later testified that her statements in this interview were also untruthful and that she had lied, again, to "protect [Repsher] and [their] relationship."

¶14    About two weeks later, while still on administrative leave, Repsher resigned from his teaching position. Lisa remained in a relationship with Repsher for another few months, until the end of her senior year; she ended the relationship after she graduated.

¶15    Some two years later, Alana—who had remained in contact with Repsher—learned that Repsher planned to apply for another teaching position. Alana believed that Repsher should not be permitted to teach again, and she contacted police and reported Repsher's previous conduct. Around the same time, Alana also contacted Lisa and asked whether she wanted to be involved in the investigation. Lisa agreed.

¶16    The State eventually charged Repsher with ten felony counts: six counts of forcible sodomy, two counts of object rape, and two counts of forcible sexual abuse. The case proceeded to a jury trial. In his opening statement, Repsher's trial attorney (Counsel) began laying the framework for Repsher's defense theory that Lisa, Alana, and Stacie had fabricated the allegations against Repsher, and that they had done so years after they finished high school. In particular, Counsel told the jury that it would be shown "some text messages between one of [Lisa's] friends and [Lisa]," sent several years after they graduated from high school, "that say, hey, I'd like you to . . . help me get [Repsher] taken care of, or something to that effect." Counsel argued that, at that point, Lisa "change[d] her story." And later in the opening statement, Counsel discussed Lisa's credibility directly, asserting that part of "the difficulty" presented in the case was that each time Lisa was interviewed by officers during high school, "she talks about different things happening at different times, contradicting everything," and Counsel posited that jurors may "hear [Lisa] say that she initially lied" but Counsel didn't "know how [Lisa was] going to explain the inconsistencies in each statement and in the internal inconsistencies."

¶17    In support of its case, the State called as witnesses Lisa, Alana, Stacie, Principal, Spanish Teacher, and English Teacher, among others, who testified as to the events described above.

¶18    During her testimony, Lisa stated that she had experienced some memory loss that she believed was attributable to the trauma she had suffered from her interactions with Repsher. On

direct examination, the State asked Lisa if she remembered "anything about [her] senior year," and Lisa responded, "Not much honestly." When asked why, Lisa testified, "Trauma likes to do that to people." The State then attempted to clarify, "Why do you say trauma?" Lisa responded, "Because what I went through was traumatic."

¶19 On cross-examination, Counsel tried to impeach Lisa by challenging the truthfulness of her allegations, pointing out that, in some important respects, her trial testimony was different from some of the statements she had made during high school, including her repeated denials to investigators that anything untoward had occurred between her and Repsher. For instance, Counsel asked Lisa whether her memory of salient events might have been better "three years ago," and Lisa responded, "I actually disagree with that. Not only do I have [post-traumatic stress disorder (PTSD)], not only does PTSD affect memory, because it controls what you remember or don't depending on how traumatic it is." Lisa went on to state that she had received electroconvulsive therapy, which she described as "a treatment for people who are resistant to medication and regular therapy for depression," and she asserted that "one of the side effects is memory loss." When Counsel pressed her on some additional discrepancies between her testimony and prior statements she had made, Lisa stated, "That's how I remembered it. Trauma is a funny thing. Sometimes it skips out on the details." Counsel pressed again, asking, "Each time you've given an interview in this case and you've sworn to tell the truth and each time it has been different, you believe that to be completely normal, it doesn't feel wrong at all?" Lisa responded, "Do you remember talking about my mental health? Do I have to explain it again?"

¶20 During Alana's testimony, she described the Facebook group chat that had taken place among Lisa, Stacie, and herself the night Lisa had told them about her relationship with Repsher. In connection with this testimony, the State attempted to introduce into evidence an exhibit containing those messages (the

Facebook Messages), but Counsel objected on both authentication and hearsay grounds. As to authentication, Counsel argued that the Facebook Messages were not properly authenticated because Alana had "testified that . . . all these messages, if not fabricated, can be modified and deleted," and that the screenshots of the Facebook Messages were "taken on her phone sometime long after the fact." The court rejected Counsel's argument and concluded that the messages had been sufficiently authenticated, explaining that Alana "was a participant in the communication. She's the one that [took a] screenshot [of] them, sent them to the police. She can identify what they are and how they were given."

¶21 As for the hearsay objection, the trial court first offered its view that because Alana was testifying, her statements in the Facebook Messages could come in without a hearsay problem. The court then addressed Lisa's and Stacie's statements, asking the State, "Is there any . . . exception to the hearsay rule with respect to [Stacie] and [Lisa]?" The State first argued that their statements were not being offered for their truth but, instead, to "give[] context to the conversation" and to prove "that the conversation happened." The court then shifted the focus of the inquiry regarding Lisa's statements, asking whether they could be "prior consistent statement[s]" that were not included in the definition of "hearsay." A discussion then ensued about whether Lisa's statements qualified as prior consistent statements, and at the conclusion of this discussion the court expressly ruled that Lisa's statements in the Facebook Messages were admissible as prior consistent statements.

¶22 After the State presented its case, Repsher took the stand to testify in his defense. He denied ever having inappropriate contact with Lisa, and he even indicated that he did not remember her all that well because she was an "[a]verage student." While Repsher recalled an occasion where Alana and others showed up at his house in the summer after Lisa's junior year, he testified that he did not remember whether Lisa was

among them. In response to Spanish Teacher's testimony, Repsher testified that Lisa was having "an emotional breakdown" and had asked him for a hug. Repsher testified that Spanish Teacher happened to walk in at the "very end" of the hug, just as the two were about to separate.

¶23 During closing argument, Counsel offered a summary of the defense theory that had been discussed during opening statement and supported during witness examinations: that Lisa, Alana, and Stacie had made up the allegations against Repsher years later, "[a]fter all the evidence was gone," and that they were motivated to do so by "high school pettiness." Counsel argued that the State presented "no physical evidence" and that "back when [there] would have been actual physical proof, these girls told a different story . . . [b]ut years later something changed."

¶24 After deliberation, the jury acquitted Repsher on two counts of forcible sodomy—the counts aimed at events that allegedly occurred at the bike shop. But the jury convicted Repsher on the other eight counts: four counts of forcible sodomy, two counts of object rape, and two counts of forcible sexual abuse. Later, the trial court sentenced Repsher to prison.

ISSUES AND STANDARDS OF REVIEW

¶25 Repsher now appeals, and he asks us to consider two issues. First, he challenges the trial court's decision to admit the Facebook Messages. "We review a court's decision to admit evidence for abuse of discretion." *State v. King*, 2024 UT App 151, ¶ 13, 559 P.3d 96 (cleaned up).

¶26 Second, he argues that Counsel rendered constitutionally ineffective assistance by failing to object to parts of Lisa's testimony. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257.

## ANALYSIS

### I. The Facebook Messages

¶27    Repsher's first challenge concerns the trial court's ruling admitting the Facebook Messages into evidence. This challenge has two components. First, he asserts that the Facebook Messages were not properly authenticated. Second, he argues that Lisa's statements in the Facebook Messages were inadmissible hearsay. We discuss these arguments, in turn, and reject them both.

### A

¶28    Repsher first contends that the State did not lay adequate foundation to authenticate the Facebook Messages. Our evidentiary rules require that an item of evidence be properly authenticated, a process that requires the proponent of admission of the item to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Utah R. Evid. 901(a). "Proper authentication does not require conclusive proof, and the proponent has to make only a prima facie showing of authenticity." *State v. Welsh*, 2022 UT App 112, ¶ 36, 519 P.3d 572 (cleaned up). The "process of authentication must be distinguished from a finding of authenticity." *State v. Jacques*, 924 P.2d 898, 901 (Utah Ct. App. 1996). "The district court is responsible for the process of authentication, whereby it assesses whether there is evidence sufficient to support a jury finding of authenticity." *Welsh*, 2022 UT App 112, ¶ 37 (cleaned up). But "the jury is ultimately responsible for determining whether the evidence is in fact authentic once the evidence is admitted." *Jacques*, 924 P.2d at 901.

¶29    In this case, the State made a prima facie showing that the Facebook Messages were authentic. First, Alana and Stacie testified as to the contents of the Facebook Messages, specifically, that the conversation in the group chat was a continuation of an in-person conversation from earlier in the day in which Lisa told

Alana and Stacie about her relationship with Repsher. Next, Alana identified herself, Lisa, and Stacie as the three contributors to the Facebook Messages. Alana also testified that she was the one who had taken screenshots of the Facebook Messages and provided them to law enforcement. She further testified that she, Lisa, and Stacie referred to themselves as the "Three Musketeers," which was the name of their group chat. From this testimony, a jury could reasonably find that the Facebook Messages were what the State purported them to be—a conversation among Lisa, Alana, and Stacie about Lisa's relationship with Repsher. Thus, the State carried its burden of making a prima facie showing of authenticity. *See United States v. Barber*, 937 F.3d 965, 970 (7th Cir. 2019) (explaining that to "authenticate Facebook records and messages, the government needed only 'to produce evidence sufficient to support a finding' that the account belonged to [the defendant] and the linked messages were actually sent and received by him" (quoting Fed. R. Evid. 901(a))).

¶30 Repsher argues that this was not enough. Specifically, he contends that such messages can be too easily fabricated, that there was no verification that Lisa's purported Facebook account actually belonged to her, that no one observed any of the declarant witnesses write or send the messages, and that Lisa's Facebook account had been deleted by the time Alana provided law enforcement the screenshots of the Facebook Messages. Repsher also points out that, although Lisa testified as a witness at trial, the State did not question her about the Facebook Messages to help lay foundation for their authentication.

¶31 But the State was not required to provide conclusive proof that the Facebook Messages were authentic; indeed, it simply needed to produce "evidence sufficient *to support a jury finding* of authenticity." *Welsh*, 2022 UT App 112, ¶ 37 (emphasis added) (cleaned up). Repsher was free to make all of the arguments above to the jury in an effort to discredit the authenticity of the Facebook Messages. *See Jacques*, 924 P.2d at 901 ("[T]he jury is ultimately responsible for determining whether the evidence is in fact

authentic once the evidence is admitted."). But whether the State provided enough evidence to support a jury finding of authenticity is a separate question, and the State satisfied its burden of making a prima facie showing of authenticity. To be sure, the State could have taken additional steps to demonstrate authenticity—for instance, it could have asked Lisa about the messages and asked her to authenticate them as well. However, the State was not necessarily required to pursue that pathway to authenticate the Facebook Messages; the pathway it selected was, on this record, sufficient.

¶32    For these reasons, the trial court did not abuse its discretion by concluding that the Facebook Messages were authenticated.

B

¶33    Repsher also challenges the trial court's ruling admitting Lisa's statements in the Facebook Messages as "prior consistent statements" not included within the definition of "hearsay." The State takes issue with this argument on the merits but, as an initial matter, it asserts that Repsher failed to preserve this challenge for our review on appeal. We first address—and reject—the State's assertion that Repsher's challenge is unpreserved. On the merits, however, the State has the better of the argument.

1

¶34    "Under our preservation rule, any issue brought on appeal must be sufficiently raised to a level of consciousness before the trial court such that the court has an opportunity to rule on it." *State v. Centeno*, 2023 UT 22, ¶ 54, 537 P.3d 232 (cleaned up). "Our preservation jurisprudence draws a distinction between issues (which must be preserved) and arguments (which consist merely of authority in support of a party's position on an issue, and do not need to be specifically made at the trial level in order to be included in a brief on appeal)." *Ocean 18 LLC v. Overage Refund Specialists LLC (In re Excess Proceeds from Foreclosure of 1107*

*Snowberry St.*), 2020 UT App 54, ¶ 17 n.1, 474 P.3d 481 (cleaned up); *see also Gressman v. State*, 2013 UT 63, ¶ 45, 323 P.3d 998 ("*Issues* must be preserved, not arguments for or against a particular ruling on an issue raised below.").

¶35    In situations "[w]here a district court itself raises and then resolves an issue sua sponte," that court "obviously had an opportunity to rule on the issue," and therefore "the basic purpose[s] of the preservation rule" are satisfied. *Helf v. Chevron U.S.A., Inc.*, 2015 UT 81, ¶ 42, 361 P.3d 63; *see also Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 (holding that an issue was preserved when "the district court not only had an opportunity to rule on the issue . . . [but] it did rule on it"); *State v. Cowlishaw*, 2017 UT App 181, ¶ 21, 405 P.3d 885 (holding that an issue was preserved when "the [district] court addressed the issue sua sponte").

¶36    In this case, the issue of whether Lisa's statements within the Facebook Messages are "prior consistent statements" that fall outside the definition of "hearsay" is adequately preserved for our review, because the trial court addressed that issue and squarely ruled on it. And given this, it does not matter that Counsel was not the one who raised the question of whether Lisa's statements qualified as "prior consistent statements." Because the trial court raised that issue itself, invited discussion on it, and then made a ruling on it, the propriety of the court's decision on that issue is preserved for our review on appeal.

2

¶37    We now turn to the merits of the trial court's ruling. Under our evidentiary rules, hearsay evidence is generally not admissible unless a rule of evidence or other law provides otherwise. *See* Utah R. Evid. 802. The term "hearsay" is defined in our rules as "a statement that . . . the declarant does not make while testifying at the current trial or hearing" and that has been offered into evidence "to prove the truth of the matter asserted in the statement." *Id.* R. 801(c). "In other words, hearsay is a

statement that the declarant originally made outside of the current trial or hearing and is now being used to prove the truth of what was said." *State v. Green*, 2023 UT 10, ¶ 83, 532 P.3d 930.

¶38 But the operative definition of hearsay excludes certain statements from its ambit, including statements sometimes referred to as "prior consistent statement[s]." *See id.* ¶ 84 (referring to the "prior consistent statement exemption to the hearsay rule"). The applicable rule of evidence states that, if the "declarant testifies and is subject to cross-examination about a prior statement," that prior statement is "not hearsay" if it "is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." Utah R. Evid. 801(d)(1)(B). Our supreme court has distilled these provisions into a four-part test, stating that a statement can be admitted into evidence "where the declarant (1) testifies, (2) is subject to cross-examination, (3) the statement is consistent with the declarant's testimony, and (4) the testimony is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." *Green*, 2023 UT 10, ¶ 84 (cleaned up). The court clarified that this "exemption" from the hearsay ban "applies only to premotive, consistent, out-of-court statements." *Id.* (cleaned up). "Its purpose is to admit statements that rebut a charge of recent fabrication or improper influence or motive, not to bolster the believability of a statement already uttered at trial." *Id.* (cleaned up). Finally, and importantly for present purposes, "[t]he rule does not require that the statement rebut *every* possible motive to fabricate." *Id.* ¶ 99.

¶39 In this case, the trial court did not abuse its discretion by admitting Lisa's statements as prior consistent statements. The first three requirements for admission are clearly met here, and Repsher does not contend otherwise: Lisa testified, was subject to cross-examination, and her statements in the Facebook Messages were consistent with her trial testimony. But Repsher contends

that the fourth requirement is not met: he asserts that Lisa's statements in the Facebook Messages were not offered to rebut a charge of recent fabrication.

¶40    The State disagrees, and it argues in response that Lisa's statements in the Facebook Messages were offered, at least in part, to rebut Repsher's specific argument that Lisa had fabricated her allegations relatively recently, after finishing high school. As noted, Counsel first advanced this theory during his opening statement, arguing that Lisa had "change[d] her story" years later after conspiring with Alana to "get [Repsher] taken care of." Counsel continued to press this theory during witness examinations, specifically questioning Lisa's credibility because she was telling a different story at trial than she had told investigators during high school.[4] The State acknowledges that Counsel's "precise theory of a motive to fabricate" is perhaps somewhat "unclear from the record," but it nevertheless observes that Counsel did raise the post-hoc-fabrication theory in Repsher's defense. As the State sees it, this is enough to sustain admission of Lisa's Facebook statements as prior consistent statements, because those statements were made during high school and before any asserted post-graduation motive to "get [Repsher] taken care of."

¶41    In making its argument, the State relies on *Green*, where our supreme court held that a prior consistent statement need not

---

4. Although we do not consider, as part of our analysis, any statements made by Counsel during closing argument—after all, statements made at that point in the trial cannot serve to open the door to admission of things already placed in front of the jury—we acknowledge the State's point that, during closing argument, Counsel summarized this theory by reiterating that Lisa (and Alana and Stacie) had made up the allegations about Repsher's sexual activity with Lisa and that they had specifically waited to do so until "[a]fter all the evidence was gone and it was their word against" Repsher's.

"rebut *every* possible motive to fabricate." *Id.* There, the court observed that the defendant had "postulate[d] various hypothetical motives for fabrication," including wanting money and notoriety, but the "main theory . . . in support of his claim that the women fabricated their allegations [was] that they had been influenced by" the publication of certain news articles. *Id.* ¶¶ 88–90. The defendant failed to "clearly articulate what about the [news articles] motivated the women to accuse him," but he argued that "five of the six [complaining witnesses] did not report being raped to the police until after at least one of the [news articles] had been published." *Id.* ¶ 89. Even though the defendant's fabrication argument lacked specificity and rested on various theories, the court held that most of the complaining witnesses' statements were admissible because "the statements that [the defendant] challenges were made long before [the date of publication] and were offered to rebut his express charge of fabrication." *Id.* ¶ 90.

¶42 So too here. Even though Repsher's fabrication argument might be a touch unclear, that argument—first articulated during opening statement—nevertheless opened the door for the State to offer Lisa's statements in rebuttal because Lisa's statements in the Facebook Messages were consistent with Lisa's trial testimony and appear to predate the fabrication theory Repsher was attempting to set forth. Our conclusion in this regard is bolstered by the fact that, in his reply brief, Repsher provides no opposition to the State's argument on this point.

¶43 Under these circumstances, we conclude that the trial court did not abuse its discretion in admitting Lisa's statements in the Facebook Messages into evidence as prior consistent statements.

## II. Lisa's Trauma Testimony

¶44 Finally, Repsher asserts that Counsel rendered constitutionally ineffective assistance by failing to object to Lisa's testimony regarding her trauma-related memory loss. Repsher

argues that Lisa's statements on this topic constituted expert testimony that did not meet the requirements of rule 702 of the Utah Rules of Evidence, and he contends that competent counsel would have objected to this testimony. But on the record before us, there were strategic reasons why Counsel may have decided to forgo an objection. Thus, we cannot conclude that Counsel's performance was deficient.

¶45 To succeed on a claim of ineffective assistance of counsel, Repsher must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶46 In evaluating the reasonableness of an attorney's performance, courts will often look to whether the attorney's actions were motivated by trial strategy. *See Scott*, 2020 UT 13, ¶ 35 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34; *see also Strickland*, 466 U.S. at 689 ("There are countless

ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

¶47 Lisa testified repeatedly that her sexual relationship with Repsher traumatized her, and she offered her view that this trauma affected her ability to recall some of the details of the sexual encounters. We acknowledge Repsher's point that at least some of this testimony may have constituted expert testimony,[5] and we even assume, for purposes of our analysis, that Counsel could have successfully argued that some of this testimony should have been excluded or stricken. Even so, it does not follow that Counsel rendered ineffective assistance by electing not to object. *See State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604 ("[J]ust because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an inherently strategic business."). "And the law recognizes the prerogative of opposing counsel to swallow

---

5. Testimony regarding the effects of trauma on memory retention may involve a variety of specialized fields of medicine. And here, Lisa not only testified to having a medical condition (PTSD) but went on to offer her view that "PTSD affect[s] memory, because it controls what you remember or don't depending on how traumatic it is." And further, Lisa described her medical treatment and its side effects—that electroconvulsive therapy is "a treatment for people who are resistant to medication and regular therapy for depression" and that "one of the side effects is memory loss." Under our rules of evidence, "if testimony, opinion or otherwise, is based on scientific, technical, or other specialized knowledge, it . . . may not be admitted as lay fact testimony." *State v. Rothlisberger*, 2006 UT 49, ¶ 20, 147 P.3d 1176 (cleaned up); *see also* Utah R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").

their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury." *State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314.

¶48    In this case, there were strategic reasons why Counsel may have chosen to forgo an objection to Lisa's trauma testimony. For instance, a reasonable attorney might have thought the jury would find Lisa's armchair medical testimony off-putting or unconvincing, thus rendering her other testimony less credible. Rather than object, Counsel might have strategically chosen to let Lisa try to fill in the gaps of missing details in her testimony with an explanation of trauma symptoms, on the theory that jurors might be unlikely to believe that Lisa was sufficiently versed in the relevant specialized medical fields to opine accordingly. And Counsel may have believed that such testimony would have come across to the jury as annoying or presumptuous, thus making Lisa less credible. In addition, a reasonable attorney might have believed that it was to his client's benefit to allow the State's main witness to discuss the reasons why her memory appeared to be faulty, because such discussion draws additional attention to the fact that the witness's memory is in fact faulty. At a minimum, we cannot say it is objectively unreasonable for an attorney to opt not to object when a State's witness appears to be calling her own memory into question.

¶49    Moreover, even if Counsel had objected, he could only have moved to strike the testimony and obtained a curative instruction. That is because Lisa's trauma testimony was largely unresponsive to the questions put to her, providing Counsel no opportunity to object before the testimony was heard by the jury. For example, when the State asked Lisa if she remembered anything about her junior year, Lisa responded that she remembered little because "[t]rauma likes to do that to people." And on cross, when Counsel asked whether Lisa might have remembered the details of her sixteenth birthday better when she was interviewed by a detective years earlier, Lisa replied, "I actually disagree with that. Not only do I have PTSD, not only

does PTSD affect memory, because it controls what you remember or don't depending on how traumatic it is." Lisa went on to state, without prompting, that she had received electroconvulsive therapy, which she described as "a treatment for people who are resistant to medication and regular therapy for depression," and that "one of the side effects is memory loss." At no point did the State or Counsel ask Lisa to opine on her diagnosis of PTSD (real or perceived) or the effects of trauma (or her medical treatment) on her memory retention. Thus, Counsel had no opportunity to object before the testimony was heard, and as a result, the only remedy Counsel could have sought—even if Counsel believed that Lisa's trauma-related testimony was unhelpful—was to have the testimony stricken from the record and a curative instruction provided to the jury.

¶50   "[W]e have often held that decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loathe to second-guess." *State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96; *see also State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 ("[A] curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure."). In this case, a reasonable attorney could have strategically decided not to reemphasize the testimony relating to Lisa's purported trauma with a curative instruction. *See State v. Garrido*, 2013 UT App 245, ¶ 26, 314 P.3d 1014 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony.").

¶51   We therefore conclude that Counsel did not perform deficiently when he opted not to object to Lisa's testimony about her purported trauma-related memory loss. On this basis, we reject Repsher's claim that Counsel rendered ineffective assistance by opting not to lodge such an objection.

CONCLUSION

¶52 The trial court did not abuse its discretion by admitting Lisa's statements in the Facebook Messages. And Repsher has not carried his burden of demonstrating that Counsel rendered ineffective assistance by failing to object to Lisa's testimony regarding trauma-related memory loss.

¶53 Affirmed.

———————